RULING AND ORDER
 

 STUART, Chief Judge.
 

 On July 16, 1981, the above-entitled matter came on for hearing before the Court pursuant to the following motions filed by plaintiffs and defendants: (1) plaintiffs’ motion for separate trials, filed April 8, 1981; (2) motions to dismiss, or, in the alternative, for summary judgment, filed on May 28, 1981 by defendants Vernon Van Wyk, Victor E. Vogelaar, Robert M. Cohn, Richard Wissink, Deloitte, Haskins & Sells and Conrad Prins and Howard K. Clark, respectively; ■ (3) Deloitte, Haskins & Sells’ motion to stqy, filed May 28, 1981 and supplemented in a reply brief filed July 10, 1981, as well as Denman & Co. and Everett-N. Sather’s adoption of such motion in a statement filed August 29, 1981; (4) defendant Charles F. Sauerman’s May 28, 1981 motion to dismiss. Alternatively, Sauerman moves for summary judgment in a supplement filed June 30, 1981; (5) separate motions to dismiss filed May 29, 1981 by defendants Kenneth R. Miller and Kenneth R. Miller, P.C. (formerly Miller, Gegner & Associates, P.C.), Denman & Co. and Everett N. Sather, and Phillip Watson and Watson, Swanson and Rubenstein, P.C. In a statement of fact filed June 30, 1981, defendants Watson and Watson, P.C. seek summary judgment on several of the grounds set forth in their initial motion.
 

 Since the date of hearing, on September 23, 1981, the Court has issued an Order granting plaintiffs’ motion for separate trials and imposing a conditional stay of proceedings with respect to Counts 10 through 21, inclusive, of the amended and substituted complaint in response to the joint request of Deloitte, Haskins and Sells, Den-man & Co. and Everett N. Sather. As to the remaining motions, the Court, after careful consideration of relevant portions of the record, briefs and documentary evidence filed in this matter, and the oral arguments of counsel, and being otherwise fully advised in the premises, enters the following Order.
 

 BACKGROUND
 

 This is an action filed by plaintiff Blaine Briggs, individually and as trustee of plaintiffs Management Service, Inc., Employees Profit Sharing Trust (Management Service Trust) and Ivan V. Sedrel Trust (Sedrel Trust) against the officers, directors, attorneys and accountants of Iowa Premium Service Co., Inc. (IPSCO), asserting claims pursuant to Sections 12(1), 12(2) and 15 of the Securities Act of 1933, Sections 10(b) and 20 of the Securities Exchange Act of 1934 and Rule 10b-5, Sections 502.201, 502.-401, 502.501 and 502.503 of the Iowa Uniform Securities Act and common law theories of attorney and accountant malpractice, fraud, negligent misrepresentation, negligent mismanagement and breach of fiduciary duty. All claims against the defendants arise out of the purchase by plaintiffs of interest-bearing promissory notes and variable rate convertible subordinated debentures issued by IPSCO in 1977, 1978 and 1980.
 

 Plaintiff Blaine Briggs, a former resident of Iowa who now resides in California, is an experienced investor who, among his other business affiliations, is a member of the board of directors of Employees Mutual Casualty Co., which company engages in the business of financing casualty insurance premiums through a subsidiary. Mr. Briggs and his wife are the sole beneficiaries of Management Service Trust, a qualified retirement plan. The Sedrel Trust is a testamentary trust created by the will of Mr. Briggs’ father-in-law. As sole trustee of both trusts, Mr. Briggs makes all investment decisions on their behalf.
 

 Past and present officers and directors of, and counsel for IPSCO, which group includes Gerald O. Sterner (Sterner), the sole
 
 *1157
 
 nonmoving defendant herein, Howard K. Clark (Clark), Phillip Watson (Watson), Watson, Swanson and Rubenstein, P.C. (Watson, P.C.), Conrad Prins (Prins), Vernon Van Wyk (Van Wyk), Robert M. Cohn (Cohn), Victor E. Vogelaar (Vogelaar) and Richard Wissink (Wissink) shall hereinafter be characterized as “management defendants”. Those defendants who were retained by IPSCO to conduct audit examinations of the corporation’s financial structure for fiscal years commencing in 1974, Den-man and Co. (Denman), Everett N. Sather (Sather), Charles F. Sauerman (Sauerman), Deloitte, Haskins and Sells (Deloitte), Kenneth R. Miller (Miller) and Kenneth R. Miller, P.C. (Miller, P.C.) shall be referred to collectively as “accountant defendants”.
 

 The following facts are accepted as true for the purpose of ruling on the above pending motions. IPSCO is an Iowa corporation formed in 1973 by defendants Sterner, Wissink, Clark, Watson and Prins to engage in the business of loaning money to finance the payment of insurance premiums on casualty insurance policies, and was at all times licensed as an industrial loan company under Iowa law. Mr. Briggs first learned of IPSCO in 1973, when defendant Sterner approached him for the purpose of extending an offer for the sale of IPSCO common stock. While plaintiff Briggs expressed his lack of interest in the offer at that time, he subsequently had an opportunity to examine bank files concerning a loan to IPSCO by the First Federal State Bank in his dual capacity as a director and member of the loan committee of the bank. In addition, Mr. Briggs heard details of IPSCO’s operations and apparent success from his friend and business associate in other unrelated ventures, defendant Howard Clark, who was a director of IPSCO.
 

 In late 1976 or early 1977, Mr. Briggs became aware through Mr. Clark that IP-SCO was issuing promissory notes bearing a relatively high rate of interest, and as a consequence sought further information from First Federal’s loan file and other sources regarding IPSCO’s investment potential. Mr. Briggs then contacted Mr. Sterner in order to discuss the offering of promissory notes and to obtain copies of the most recent audited financial statement, the 1976 statement compiled by Deloitte, as well as IPSCO’s current monthly unaudited financial statement. After review thereof, in February of 1977, Mr. Briggs as trustee of the Management Service Trust purchased an interest-bearing promissory note with a face value of $50,000. All IPSCO notes purchased by Management Service Trust prior to 1980 have been repaid.
 

 Later in 1977, Briggs in. his role as trustee purchased an IPSCO subordinated convertible debenture in the principal amount of $100,000 for the Management Service Trust. A second $100,000 debenture was purchased by Briggs as Trustee of this trust on November 30, 1978. During the period extending from April 21, 1980 to July 2, 1980, Mr. Briggs intermittently loaned money to IPSCO, individually and on behalf of both trusts, in exchange for interest-bearing promissory notes. With the exception of the April 21 loan, which had a maturity date of July 28, 1980, all other obligations were payable upon demand. Each of the foregoing notes was part of an offering whereby notes were issued to a total of 49 investors.
 

 A demand note purchased by Mr. Briggs as representative of the Management Service Trust on April 1, 1980 was surrendered and paid by IPSCO on July 1, 1980 with cash and yet another note issued on that date. The cash payment has since been relinquished in part by the plaintiff trust as a preference in IPSCO’s bankruptcy proceeding, and reimbursement for principal and interest due on the July 1, 1980 note is sought by plaintiffs in this action.
 

 Annual financial statements for the years 1974 through 1980 were prepared by the following accountants or accounting firms: (1) 1974 and 1975: Miller, P.C.; (2) 1976: Deloitte; (3) 1977 and 1978: Sauerman; and (4) 1979 and 1980: Denman and Sather. None of the certified statements compiled by the aforementioned accountants revealed the poor financial condition of IP-SCO attributed by plaintiffs to the fraud
 
 *1158
 
 perpetrated against the corporation by Daniel Stephenson, a Fort Dodge, Iowa insurance agent whose agency arranged fictitious premium loan transactions for IPSCO. Shortly after Mr. Briggs learned of the fraud in July of 1980, IPSCO filed a bankruptcy petition in the United States Bankruptcy Court for the Southern District of Iowa under Chapter 11 of the Bankruptcy Code.
 

 STANDARDS GOVERNING REVIEW OF PENDING MOTIONS
 

 A.
 
 Motions to Dismiss for Failure to State a Claim
 

 In ruling upon a motion to dismiss for failure to state a claim, the Court must accept as true all well-pleaded allegations of the complaint and construe them in a light most favorable to the complainant.
 
 Hospital Building Co. v. Trustees of Rex Hospital,
 
 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976);
 
 Scheuer v. Rhodes,
 
 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Fact pleading is not required, and “a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no facts in support of his claim.”
 
 Conley v. Gibson,
 
 355 U.S. 41, 45-46, 78 S.Ct. 99,101-102, 2 L.Ed.2d 80 (1957). See
 
 Laurales v. Desha County School District No. 4,
 
 632 F.2d 72, 73 (8th Cir. 1980). However, the plaintiff must at a minimum show the prima facie elements of his claim in order to avoid a Rule 12(b)(6) dismissal.
 
 Hungate
 
 v.
 
 United States,
 
 626 F.2d 60, 62 (8th Cir. 1980). If the Court should determine, after assuming the truth of the facts recited in the complaint, that plaintiff’s cause is without merit, summary dismissal of the complaint under the provisions of Rule 12(b)(6) is appropriate.
 
 Laurales v. Desha County School District No. 4,
 
 632 F.2d at. 74;
 
 Hungate v. United States,
 
 626 F.2d at 62.-
 

 B.
 
 Motions for Summary Judgment
 

 Summary judgment is appropriate only when the pleadings, discovery and affidavits on file demonstrate that no genuine issue of material fact remains in dispute and that the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c);
 
 Vette Co. v. Aetna Casualty and Surety Co.,
 
 612 F.2d 1076, 1077 (8th Cir. 1980). This is a drastic remedy, and the movant bears the heavy burden of establishing his right to judgment with such clarity as to leave no room for controversy and of proving that the nonmovant could not recover under any discernible circumstances.
 
 Butler v. M.F.A. Life Insurance Co.,
 
 591 F.2d 448, 451 (8th Cir. 1979). The evidence must be viewed in the light most favorable to the party opposing the motion, who is entitled to the benefit of all reasonable inferences to be drawn from the record before the court.
 
 McLain v. Meier,
 
 612 F.2d 349, 356 (8th Cir. 1979).
 

 Once a motion for summary judgment is made and supported by affidavits or other evidentiary material, however, the non-moving party may not rely upon the allegations of his pleadings, but must resist the motion by presenting specific facts generating a genuine issue of fact for trial. Federal Rules of Civil Procedure 56(e);
 
 Burst v. Adolph Coors Co.,
 
 650 F.2d 930, 931 (8th Cir. 1981). A grant of summary judgment, when appropriate, fulfills the salutory purpose of avoiding useless and time-consuming trials.
 
 Butler v. M.F.A. Life Insurance Co.,
 
 591 F.2d at 451.
 

 Where appropriate, the motions to dismiss filed herein will be treated as motions for summary judgment pursuant to Federal Rules of Civil Procedure 12(b)(6) in instances where the movants refer to such matters outside the pleadings as the deposition of Blaine Briggs or the affidavits of various parties.
 
 Woods v. Dugan,
 
 660 F.2d 379, 380-381 (8th Cir. 1981). Further, because plaintiffs indicate that they were given adequate notice and opportunity, within the meaning of Rule 12, to dispute the claims asserted in defendants’ motions with countervailing evidentiary material made pertinent thereto by Rule 56, and have in fact done so, the Court now deems all pending motions fully submitted.
 
 Id.
 
 at 381.
 

 
 *1159
 
 Because virtually identical challenges to the amended and substituted complaint are raised in defendants’ motions, the Court in order to avoid duplication will utilize plaintiffs’ statement of the issues and consider each motion insofar as it relates to a particular issue, taking into account the essential similarities and differences inherent in each defendant’s position.
 

 Two preliminary matters must be disposed of by the Court before proceeding to review the substance of the pending motions. First, defendants Prins and Clark challenge plaintiffs’ reliance on Exhibit 56, based on the lack of any identification or authentication thereof. According to plaintiffs, this exhibit, an unsigned letter from Sauerman to Clark with copy to Sterner, dated May 12,1978, was introduced into the deposition of Blaine Briggs by counsel for defendant Miller. Neither Briggs nor any other party has been able to properly identify the document in question.
 

 The Court agrees that consideration of this letter in support of plaintiffs’ resistance to defendants’ motions would be inappropriate under Federal Rule of Evidence 901 in the absence of identification and authentication. All references to Exhibit 56 by any party shall therefore be disregarded by the Court in considering defendants’ motions.
 

 On July 15, 1981, plaintiffs filed a resistance to the untimely filing of affidavits by defendants Cohn, Van Wyk and Vogelaar. The disputed affidavits were filed on July 10, 1981, the final date established by Magistrate Longstaff in his pretrial order of April 10, 1981 for response to plaintiffs’ resistance to pending motions. Defendants having complied with the Magistrate’s directive, the Court finds no merit in plaintiffs’ objection and declines to strike the affidavits in issue.
 

 The Court also recognizes that these motions are before the Court at a relatively early time in the discovery process and has given this fact consideration where it felt additional discovery might strengthen plaintiffs’ position. However, the Court felt that it would be beneficial to all parties if the Court set forth the law which in his opinion is applicable to the issues presented to give guidance in any future proceedings.
 

 In furtherance of the important goals of judicial economy and efficiency, the Court deems it appropriate to rule on a portion of defendants’ motions at the present time, with a supplemental ruling on the remainder of such motions to be issued forthwith. STATUS OF IPSCO INSTRUMENTS AS SECURITIES
 

 Miller, Miller, P.C. and Deloitte seek dismissal or summary judgment with respect to Counts 2, 3, 4, 10, 11, 12, 13 and 16, contending that this Court lacks jurisdiction to consider claims interposed in such counts because the promissory notes in question evidence mere commercial loans rather than securities within the purview of federal and state securities law. Deloitte alone argues that the subordinated convertible debentures purchased by plaintiffs are not securities. Because the moving defendants make reference to matters outside the pleadings, and plaintiffs acknowledge notice thereof, the Court shall evaluate their motions under guidelines established in Rule 56.
 

 Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(l) provides that:
 

 When used in this subchapter, unless the context otherwise requires—
 

 (1) The term “security” means any note, stock, treasury stock, bond, debenture, evidence of indebtedness . . . or warrant or right to subscribe to or purchase, any of the foregoing.
 

 The definition of the term “security” expounded in Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), is almost identical to that of Section 2(1) of the 1933 Act, with two differences: The 1934 Act omits the phrase “evidence of indebtedness” and excludes from coverage:
 

 Any note, draft, bill of exchange, or bankers’ acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace,
 
 *1160
 
 or any renewal thereof the maturity of which is likewise limited.
 

 15 U.S.C. § 78c(a)(10). Despite such differences, however, the definitions recited in •both statutes are viewed by the Supreme Court as functionally equivalent.
 
 International Brotherhood of Teamsters v. Daniel,
 
 439 U.S. 551, 556 n. 7, 99 S.Ct. 790, 795 n. 7, 58 L.Ed.2d 808 (1979);
 
 United Housing Fdn., Inc. v. Forman,
 
 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975).
 

 In determining whether an instrument constitutes a security, the Court is guided by the Supreme Court’s admonition that the federal securities laws are remedial in nature, and hence should be construed broadly, giving due regard to the substance rather than the form of the transaction in issue. See
 
 Affiliated Ute Citizens v. United States,
 
 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972);
 
 Tcherepnin v. Knight,
 
 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Thus the Court must consider the “economic realities underlying a transaction and not the name appended thereto.”
 
 United Housing Fdn., Inc. v. Forman,
 
 421 U.S. at 849, 95 S.Ct. at 2059.
 

 The Court is satisfied that the ten-year interest bearing convertible debentures purchased by plaintiff Blaine Briggs on behalf of Management Service Trust in 1977 and 1978 are securities for purposes of the 1933 and 1934 Acts, as well as the Iowa Uniform Securities Act. According to the subscription agreements, these instruments were issued to raise additional capital, were subordinated as to payment to all bank and insurance company lenders, and were convertible at the holder’s option to IPSCO common stock at a fixed rate of $4.50/share.
 

 As defined in 15 U.S.C. §§ 77b(l) and 78e(a)(10), the term “security” includes the right to subscribe to or purchase any stock, which right has in turn been construed as encompassing contractual rights or options to purchase or sell stock. ,
 
 Blue Chip Stamps v. Manor Drug Stores,
 
 421 U.S. 723, 750-751, 95 S.Ct. 1917, 1932-1933, 44 L.Ed.2d 539 (1975);
 
 Mansbach v. Prescott, Ball and Turben,
 
 598 F.2d 1017, 1026 n. 40 (6th Cir. 1979). A convertible debenture, which can be analogized to an option or entitlement to purchase shares, is considered a security within the contemplation of both the Securities Act and the Securities Exchange Act. See
 
 Kusner v. First Pennsylvania Corp.,
 
 531 F.2d 1234, 1237 (3rd Cir. 1976);
 
 Jordan Bldg. Corp. v. Doyle, O’Connor & Co.,
 
 401 F.2d 47, 48-49 (7th Cir. 1968);
 
 Herbst v. Able,
 
 278 F.Supp. 664 (S.D.N.Y.1968);
 
 Weitzen v. Kearns,
 
 271 F.Supp. 616, 619 (S.D.N.Y.1967); Bromberg, Securities Law & Commodities Fraud, § 4.6(311), at page 82.6 (1981 ed.); 69 Am.Jur.2d, Securities Regulation — Federal, § 18 at pages 604-605 (1973 ed.)
 

 The decision as to whether or not the 1980 note transactions are securities is much more complex. To date, the United States Supreme Court has not considered the note problem. In addressing this issue, the lower courts have rejected the notion that Congress intended to classify all notes as securities within the purview of the 1933 and 1934 Acts and have taken various approaches in attempting to determine the security status of the particular notes involved. Sonnenschein, Federal Securities Law Coverage of Note Transactions: The Antifraud Provisions, 35 Bus. Law 1567, 1568-1569 (1980). It is well-established that not all notes are securities under the 1933 and 1934 Acts, regardless of the broad scope of the statutory language. See
 
 Emisco Industries, Inc. v. Pro’s, Inc.,
 
 543 F.2d 38, 39 (7th Cir. 1976);
 
 Great Western Bank & Trust v. Kotz,
 
 532 F.2d 1252, 1256 (9th Cir. 1976). By the same token, short-term notes with a maturity not exceeding nine months, while expressly excluded from the definition of security outlined in 15 U.S.C. § 78c(a), do not necessarily fall outside the coverage of the 1934 Act. See
 
 Woodward v. Metro Bank of Dallas,
 
 522 F.2d 84, 92 (5th Cir. 1975);
 
 Zeller v. Bogue Electric Mfgr. Corp.,
 
 476 F.2d 795, 799-800 (2d Cir.), cert. den., 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973);
 
 Sanders v. John Nuveen & Co., Inc.,
 
 463 F.2d 1075, 1078-1080
 
 *1161
 
 (7th Cir.), cert. den., 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972);
 
 Mallinckrodt Chemical Works v. Goldman, Sachs & Co.,
 
 420 F.Supp. 231, 239-240 (S.D.N.Y.1976). Nor has the question of whether a demand note qualifies as having a maturity of less than nine months under the 1934 Act been resolved. Sonnenschein, Federal Securities Law Coverage of Note Transactions: The Antifraud Provisions, 35 Bus. Law at 1574 n. 25.
 

 Rather than focusing on the term of a particular note, therefore, the courts in giving effect to congressional concern for investors examine the circumstances of a subject transaction in order to determine whether said transaction was entered into for investment purposes, or was primarily commercial in nature and thus beyond the scope of the securities laws.
 
 United Housing Fdn., Inc. v. Forman,
 
 421 U.S. at 852-853, 95 S.Ct. at 2060-2061;
 
 Frederiksen v. Poloway,
 
 637 F.2d 1147,1150 (7th Cir.), cert. den., - U.S. -, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981);
 
 McClure v. First Nat’l Bank,
 
 497 F.2d 490, 494-495 (5th Cir. 1974), cert. den., 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975).
 

 Both groups of moving defendants urge the Court to follow the Seventh Circuit’s reading of
 
 United Housing Fdn., Inc. v. Forman,
 
 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), to require the application of the “investment contract” test defined in
 
 SEC v. W. J. Howey Co.,
 
 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) to promissory notes. See
 
 Frederiksen v. Poloway, supra; Emisco Industries, Inc.
 
 v.
 
 Pro’s, Inc., supra.
 
 Under the
 
 Howey
 
 test, the courts must consider whether a specific transaction “involves an investment of money in a common enterprise with profits to come solely from the efforts of others.”
 
 SEC v. W. J. Howey Co.,
 
 328 U.S. at 301, 66 S.Ct. at 1104.
 

 The Court cannot accept the Seventh Circuit’s extension of the
 
 Howey
 
 analysis to note transactions. As Judge Friendly pointed out, the Supreme Court “has not yet had the note problem before it, and the test seems ... to be of dubious value in that context.”
 
 Exchange National Bank of Chicago v. Touche Ross & Co.,
 
 544 F.2d 1126, 1136 (2d Cir. 1976). In the Court’s opinion,
 
 Forman
 
 should not be interpreted as compelling application of the investment contract criteria to all of the instruments specifically denoted in the Acts as securities.
 

 In
 
 Forman,
 
 the Court employed the “investment contract” test developed in
 
 Howey
 
 in considering whether shares in a cooperative housing association, issued to assure holders of an apartment in a low-cost development, were entitled to the protection of federal securities provisions. The
 
 Forman
 
 court considered only the terms “stock” and “investment contracts” in finding that these shares were not securities within the meaning of the 1933 and 1934 Acts. Turning first to an assessment of Congress’ intent in promulgating these statutes, the Supreme Court observed:
 

 The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, . . . and the need for regulation to prevent fraud and to protect the interests of investors. Because securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto.
 

 United Housing Fdn., Inc. v. Forman,
 
 421 U.S. at 849, 95 S.Ct. at 2059. After weighing the “economic realities” of the disputed purchases, the
 
 Forman
 
 court concluded that the shares were not stock because they lacked the characteristics traditionally associated therewith, including the right to receive a proportionate share of the profits through dividends. Instead, “the inducement to purchase was solely to acquire subsidized low-cost living space: it was not to invest for profit.”
 
 Id.
 
 at 851, 95 S.Ct. at 2060.
 

 Because the court below had held, as an alternative ground for its decision, that the shares were investment contracts, as well as stock under the Securities Acts, the Supreme Court then applied the
 
 Howey
 
 test, stating that:
 

 
 *1162
 
 The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors’ funds.
 

 Id.
 
 at 852, 95 S.Ct. at 2060. It was in connection with its analysis of those shares as investment contracts that the Supreme Court opined:
 

 What distinguishes a security transaction — and what is absent here — is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or living quarters for personal use.
 

 Id.
 
 at 858, 95 S.Ct. at 2063.
 

 The Court does not believe that the Supreme Court intended all terms encompassed within the statutory definitions of “security” to be circumscribed by the investment contract elements set forth in
 
 Howey.
 
 Taken out of context, the previous quote would appear to permit such an extension of
 
 Howey,
 
 but it would be difficult if not impossible to fit any note, debenture or even preferred stock within that framework. See Sonnenschein, Federal Securities Law Coverage of Note Transactions: The Antifraud Provisions, 35 Bus. Law. at 1594-1595. Those terms cannot, in the Court’s estimation, be read out of the Acts. Accordingly, the Court believes that the key to deciding whether a particular instrument is a “security” is flexibility, or an ability “to meet the countless and variable schemes devised by those who seek the use of the money of others on the premise of profits.”
 
 Tcherepnin v. Knight,
 
 389 U.S. at 338, 88 S.Ct. at 554. In this regard, the term “profits” as employed in
 
 Tcherepnin
 
 should be construed, where appropriate, to include interest or a fixed return on investments.
 

 The Second Circuit through Judge Friendly advocated reliance on the statutory language itself as the best alternative available to evaluating the security status of a note under the 1933 and 1934 Acts.
 
 Exchange National Bank of Chicago v. Touche Ross & Co.,
 
 544 F.2d at 1137-1138. Judge Friendly emphasized the prefatory exception present in both Acts, “unless the context otherwise requires”, stating that the plain terms of the foregoing statutes should be applied unless the context of a particular transaction dictates otherwise.
 

 A party asserting that a note of more than nine months maturity is not within the 1934 Act (or that a note with a maturity of nine months or less is within it) or that any note is not within the anti-fraud provisions of the 1933 Act has the burden of showing that ‘the context otherwise requires’.
 

 Id.
 

 Applying the
 
 Touche Ross
 
 approach herein, the Court is of the opinion that the defendants would bear the burden of proving that the debentures and demand notes are excluded from coverage under either the 1933 or 1934 Acts. As to the note of less than nine months maturity, defendants must again shoulder the burden of establishing that it falls outside the ambit of the 1933 Act, while plaintiffs must prove that the context otherwise mandates inclusion of such note within the protection of the 1934 Act.
 

 Whether the facts and circumstances here are examined under the Second Circuit test of “strong family resemblance” to the examples set forth in
 
 Exchange Bank,
 
 544 F.2d at 1138, the Fifth Circuit commercial/investment approach formulated in
 
 Bellah v. First National Bank of Hereford,
 
 495 F.2d 1109, 1112-1113 (5th Cir. 1974) or the Ninth Circuit risk capital approach first developed in
 
 Great Western Bank & Trust Co. v. Kotz,
 
 532 F.2d at 1257, the Court has no difficulty in holding that the debentures, the demand notes and the short term note under the undisputed facts of this case are all securities within the terms of both Acts. The Acts focus upon the “capital market of the free enterprise system: the sale of securities to raise capi
 
 *1163
 
 tal for profit making purposes, . . . and the need for regulation to prevent fraud and to protect the interest of investors.”
 
 United Housing Fdn., Inc. v. Forman,
 
 421 U.S. at 849, 95 S.Ct. at 2059. The economic realities surrounding the transactions herein involved clearly show that the purpose of the loan and the need for regulation require a finding that the instruments in issue are securities within the contemplation of the securities statutes.
 

 IPSCO offered the notes and debentures to the public to obtain risk capital for use in its business of loaning money to individuals who were to use the loans to finance the payment of insurance premiums on casualty insurance policies. Plaintiffs purchased the notes and debentures as investments and was attracted to them by the high interest rates. Plaintiffs allege reliance on the financial information received from IPSCO in weighing the risk against the return. Regulation is essential to prevent fraud and to protect the investor in this type of note transaction.
 

 Therefore, the Court denies the Miller, Miller P.C. and Deloitte motions for summary judgment as to Counts 2, 3, 4, 10, 11, 12, 13 and 16 on the ground that the debentures and notes were not securities. The Court holds they are securities within the meaning of both the 1933 and 1934 Acts.
 

 CASE OR CONTROVERSY
 

 Deloitte moves for dismissal or summary judgment on the ground that Mr. Briggs’ deposition testimony and the complaint itself disclose the absence of a genuine case or controversy pending the resolution of plaintiffs’ claims against IPSCO in bankruptcy court. Alternatively, Deloitte seeks a stay of this action until the Chapter 11 proceeding is concluded. In a reply brief filed July 10, 1981, defendant limits its request for a stay to all claims brought against the accountant defendants until numerous state court suits, as well as the bankruptcy litigation, are disposed of.
 

 On September 23, 1981, the Court imposed a carefully circumscribed stay of non-registration claims delineated in Counts 10 through 21 of the amended and substituted complaint pending the outcome of state court actions which bear upon the subject matter of the case at bar, in response to a joint request interposed by defendants Deloitte, Denman and Co. and Sather. Based on the aforementioned ruling, the Court believes the concerns expressed in Deloitte’s motion have been fully addressed.
 

 In any event, the Court is satisfied that defendant has failed to show the absence of a justiciable case or controversy under the rigorous standards of Rule 56. Contrary to defendant’s contention, the complaint and Briggs’ deposition demonstrate that plaintiffs have sustained actual, presently quantifiable economic injury which may be shown at trial to have been caused by acts or omissions of both management and accountant defendants. Moreover, while plaintiffs pray for recovery of the consideration paid for the disputed notes and debentures, which relief they may or may not secure in IPSCO’s bankruptcy proceeding, they nonetheless seek to adjudicate rights and obligations herein which either cannot or have not been raised in bankruptcy court, including a claim for exemplary or punitive damages.
 

 Regardless of Briggs’ apparent inability to articulate the full extent of his financial loss until the Chapter 11 proceeding has been terminated, plaintiffs’ claims for damages are now choate and have been sufficiently defined in the amended and substituted complaint. Any recovery inuring to Mr. Briggs or his trusts in bankruptcy court may ultimately function to reduce plaintiffs’ damages in this action, should they prevail on the merits of their claims. Finally, the Court can conceive of no legal bar to an investor’s maintenance of suit for the purchase price of securities once the corporation itself has gone into bankruptcy. See, e.g.,
 
 Holloway
 
 v.
 
 Howerdd,
 
 377 F.Supp. 754, 759 (M.D.Tenn.1973), aff’d in pertinent part, 536 F.2d 690 (6th Cir. 1976).
 

 Therefore, after reviewing defendant’s motion under the provisions of Rule 56, the Court is convinced that the issues raised in plaintiffs’ amended and substituted com
 
 *1164
 
 plaint are ripe for adjudication. Deloitte’s motion for summary judgment on this ground shall be denied.
 

 CONTROL LIABILITY
 

 Plaintiffs contend that the management defendants, which include Prins, Clark, Cohn, Van Wyk, Vogelaar, Watson and Watson, P.C. and Wissink, are “controlling persons” of IPSCO within the meaning of Section 20(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 78t (Count 13) and Section 15 of the 1933 Securities Act, 15 U.S.C. § 77o (Counts 3 and 11), and that any wrongdoing of the corporation is consequently attributable to them. Vicarious liability under the Iowa Securities Law is also asserted pursuant to Section 502.503(1) of the Iowa Code (Counts 7 and 15).
 

 Each moving defendant focuses exclusively on plaintiffs’ failure to join the alleged primary violator, IPSCO, contending that a prior adjudication of the corporation’s underlying liability is essential to extending vicarious liability to corporate officers and directors. Provisions for imposition of such liability for acts or omissions of persons in one’s control are found in both the 1933 and 1934 Acts. Section 78t is similar to Section 77o, thus both statutes will be given the same construction herein. See
 
 Pharo v. Smith,
 
 621 F.2d 656 (5th Cir.), ret. granted and cause rem., 625 F.2d 1226 (1980).
 

 Section 15 of the 1933 Act, 15 U.S.C. § 77o provides as follows:
 

 Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency or otherwise, controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person had no knowledge or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
 

 Similarly, Section 20(a) of the 1934 Act, 15 U.S.C. § 78t, states:
 

 Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
 

 Controlling persons may be held responsible for the misconduct of the controlled entity under Iowa law only where such persons materially aided in an act or transaction violative of either Sections 502.-501 or 502.502 of the Iowa Code, with knowledge thereof. Section 502.503(1). This Court has previously opined that a determination of control liability under the federal securities law is dispositive of the state law question of a defendant’s possible involvement in or awareness of the manner in which acts constituting the primary violation were accomplished.
 
 Yantis v. Haweye Land, Ltd.,
 
 Civil No. 73-56-D (S.D.Ia., Order filed October 29, 1981). See Section 502.611 of the Iowa Code. The parties appear to take the same position.
 

 To prevail on a federal securities claim brought under the derivative liability provisions of the 1933 or 1934 Acts, a complainant must prove (1) the controlled person’s acts or omissions constituting an infringement of the pertinent federal securities statute; (2) that the controlling person possessed either direct or indirect influence or power over the management of the controlled person; and (3) the statutory good faith defenses are not available to the controlling person once the existence of a control relationship is established. See
 
 Swenson v. Engelstad,
 
 626 F.2d 421, 425 (5th Cir. 1980);
 
 Rochez Bros., Inc. v. Rhoades,
 
 527 F.2d 880, 891 (3rd Cir.), cert. den., 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1975);
 
 Gordon v. Burr,
 
 506 F.2d 1080, 1081, 1085-1086 (2d Cir. 1974). There is no express requirement in either Section 15 or Section
 
 *1165
 
 20(a) of joinder of the primary offender where a complainant seeks to impute liability for that entity’s conduct to the controlling person.
 

 Sections 15 and 20(a) mandate a finding of the controlled person’s transaction of a sale of securities in contravention of the applicable securities law as a necessary prerequisite to imputation of liability therefor to the controlling person. Under circumstances such as those herein, however, where the primary offender is insolvent or otherwise unavailable, the courts have proceeded to adjudicate the underlying liability of that offender regardless of its presence as a party-defendant. However, the prior adjudication issue before the Court was not raised in these cases. See
 
 Swenson
 
 v.
 
 Engelstad,
 
 supra, (primary violatordefunct and not joined as a defendant, controlling persons held liable for sale of unregistered securities violative of the 1933 Act);
 
 Christoffel v. E. F. Hutton, Inc.,
 
 588 F.2d 665 (9th Cir. 1978) (defendant brokerage firm sued as controlling person under § 20(a) for losses sustained by an incompetent’s estate caused by dissipation of estate’s assets by defendant’s employee, who was not joined as a defendant. Lower court’s conclusion that under the facts presented, the defendant exercised no control over the employee with respect to conduct outside the scope of employment upheld);
 
 Holloway v. Howerdd,
 
 377 F.Supp. 754 (M.D.Tenn.), aff’d in pertinent part, 536 F.2d 690 (6th Cir. 1976) (primary offender filed bankruptcy and not joined as a party-defendant in shareholder’s suit, court proceeded to adjudicate liability of alleged controlling persons under §§ 15 and 20(a)). None of the cases cited by defendants support the proposition that the primary violator’s presence is a condition precedent to maintenance of an action under derivative liability provisions of federal or analogous state securities statutes.
 

 In keeping with the broad remedial purpose of the securities laws, whether state or federal, the Court will not permit officers and directors of a bankrupt corporation whose actions are alleged to have contributed to that condition to avoid the possible imposition of liability under such laws by asserting the lack of a prior adjudication against the controlled person as a basis for dismissal. See
 
 SEC v. Savoy Industries,
 
 587 F.2d 1149, 1170 n. 47 (D.C.Cir.1978);
 
 Kemmerer v. Weaver,
 
 445 F.2d 76, 78-79 (7th Cir. 1971). See generally Folk, Civil Liabilities Under the Federal Securities Acts: The Bar Chris Case, 55 Va.L.Rev. 199, 217-218 (1969); Note, Liability of Corporate Directors as “Controlling Persons” under Section 20(a) of the Securities Exchange Act, 28 Drake L.Rev. 437, 439 (1978-1979). The primary liability of the controlled person is merely a required element of proof before a controlling person can be held vicariously liable. As a matter of law, therefore, defendants are not entitled to summary judgment on this ground, nor is judgment appropriate under the facts and circumstances of this case. Similarly, the Court concludes that the well-pleaded allegations of the amended and substituted complaint are sufficient to withstand the motion to dismiss filed by defendants Watson and Watson, P. C. Accordingly, the motions to dismiss or for summary judgment directed to Counts 3, 7, 11, 14, and 15 are hereby denied. AIDING AND ABETTING LIABILITY FOR VIOLATIONS OF 15 U.S.C. § 777(1) AND CODE OF IOWA SECTIONS 502.201 AND 502.501
 

 Count 4 of the amended and substituted complaint charges Watson and Watson, P.C. with aiding and abetting the management defendants in committing violations of Section 12(1) of the Securities Act of 1933, 15 U.S.C. § 777(1). Count 8 charges them with aiding and abetting violations of Section 12(l)’s Iowa analogues. As the language of the state and federal statutes is nearly identical, the following discussion applies to both Count 4 and Count 8.
 

 Watson and Watson, P.C. have moved for summary judgment on the ground that plaintiffs have not alleged the required scienter. Plaintiffs argue that scienter becomes an element of aiding and abetting only when the underlying violation itself requires proof of the defendant’s state
 
 *1166
 
 of mind, and that scienter is not a required element of proof in a cause of action for failure to comply with registration statutes. A party need not prove scienter to recover for violations of Section 12(1), 15 U.S.C. § 771(1).
 
 Pharo v. Smith,
 
 621 F.2d 656, 665 (5th Cir.), rehearing granted and cause remanded, 625 F.2d 1226 (1980);
 
 Lawler v. Gilliam,
 
 569 F.2d 1283, 1285 (4th Cir. 1978).
 

 In this case, the allegations that these defendants knew the securities were subject to the registration requirement and knew they were being offered for sale without registration are sufficient to satisfy any intent requirement. A factual issue has been raised as to such knowledge. Therefore, the Court will deny defendants’ motion on this ground.
 

 Watson and Watson, P.C. also argue that there is no implied cause of action for aiding and abetting violations of 15 U.S.C. § 771(1). Recently, on appeal from an entry of summary judgment by the Minnesota district court in favor of an attorney and his former law firm on claims of negligent misrepresentation and aiding and abetting violations of federal and state securities laws, the Eighth Circuit adopted a tripartite test for imposition of aiding and abetting liability for Section 10(b) and Rule 10b-5 offenses.
 
 Stokes v. Lokken,
 
 644 F.2d 779 (8th Cir. 1981). In the Court’s opinion, this test would be equally applicable to claims brought under Section 12.
 

 Under the three-pronged test, derivative liability for fraud may be imposed if proof of each of the following elements is established:
 

 (1) The existence of a securities law violation by the primary party (as opposed to the aiding and abetting party);
 

 (2) ‘knowledge’ of the violation on the part of the aider and abettor; and
 

 (3) ‘substantial assistance’ by the aider and abettor in the achievement of the primary violation.
 

 Stokes v. Lokken,
 
 644 F.2d at 782-783 (citations omitted).
 

 A theory of aiding and abetting liability for violations of Section 5 of the 1933 Act, viewed by the court as raising a claim for secondary liability under Section 12 of the 1933 Act, was also urged on appeal. Because no proof of the defendants’ participation in the challenged securities transaction had been adduced, however, the
 
 Lokken
 
 court quickly disposed of this issue. While reluctant to define the outermost parameters of Section 12, the court opined that the acts or omissions of “the alleged aider and abettor must somehow bring him within the purview of § 12, which by its very language applies only to sellers.”
 
 Id.
 
 at 785. Adopting the Fifth Circuit’s analysis of the issue in
 
 Pharo v. Smith,
 
 621 F.2d 656 (5th Cir.), reh. granted and cause remanded, 625 F.2d 1226 (5th Cir. 1980), the court concluded that the term “seller”, though not limited to the actual transferor of title to securities, could not be construed to include one who is not in privity with the purchaser or whose participation in the underlying transaction is not a “substantial factor in causing the transaction to take place.”
 
 Stokes
 
 v.
 
 Lokken,
 
 644 F.2d at 785.
 

 As the
 
 Lokken
 
 court pointed out, Section 12 expressly confines the allocation of liability to those who either offer or sell a security.
 
 Id.
 
 Judicial expansion of the statutory language has led to a gradual, albeit cautious, erosion of this strict rule of privity, allowing liability to attach to those who have actively participated in the illegal sale, either as aiders and abettors or co-conspirators. See
 
 In re Itel Securities Litigation,
 
 89 F.R.D. 104, 116-117 (N.D.Cal.1981) (Section 12(2));
 
 de Bruin v. Andromeda Broadcasting Systems,
 
 465 F.Supp. 1276, 1280 (D.Nev. 1979) (Section 12);
 
 Brick v. Dominion Mortgage & Realty Trust,
 
 442 F.Supp. 288, 306 (W.D.N.Y.1977) (Section 12(2));
 
 Stern v. American Bankshares Corp.,
 
 429 F.Supp. 818, 826 (E.D.Wis.1977) (Section 12(2));
 
 Sandusky Land, Ltd. v. Uniplan Groups, Inc.,
 
 400 F.Supp. 440, 444 (N.D.Ohio 1975) (Section 12(2));
 
 In re Ceasers Palace Securities Litigation,
 
 360 F.Supp. 366, 383 (S.D.N. Y.1973) (Section 12(2)).
 

 Aiding and abetting and conspiracy theories have been repudiated by the Fifth Cir
 
 *1167
 
 cuit in the context of Section 12 litigation.
 
 Huddleston v. Herman & MacLean,
 
 640 F.2d 534, 551 n. 27 (5th Cir. 1981);
 
 Croy v. Campbell,
 
 624 F.2d 709, 713 n. 5 (5th Cir. 1980). It was the court’s opinion in
 
 Huddleston
 
 that the concept of “sellers” embraced those persons in privity with the buyer or whose participation in the sale of securities was a substantial factor in its ultimate consummation.
 
 Id.
 
 Alternatively, the test for a Section 12 seller could be formulated in terms of the tort principle of causation, that is, whether the plaintiff’s injury can be said to have flowed directly and proximately from the conduct of the defendant “or whether the defendant was the motivating force behind the sale.”
 
 Id.
 

 There is considerable precedent for the Fifth Circuit’s rejection of traditional doctrines of secondary liability in suits arising under Sections 12(1) and (2). According to one commentator:
 

 A conceptual barrier to the adoption of aiding-abetting and conspiracy notions for § 12(2) [or § 12(1)] is that the provision merely imposes a liability. It does not (like SA § 17(a) or Rule 10b-5) define a violation or make an act unlawful. Aiding-abetting and conspiracy, with their criminal origins, are more conformable to a violation section than to an express liability section.
 

 3A Bromberg, Securities Fraud and Commodities Fraud, Section 8.5(315) at 206.7 (1981). Application of the aiding and abetting concept to Section 12 defendants might well permit an unwarranted extension of liability to those who do not fit within the categories of putative defendants contemplated by Congress when drafting the statute. See
 
 In re Equity Funding Corp. of America Securities Litigation,
 
 416 F.Supp. 161, 181 (C.D.Cal.1976). See also
 
 Collins v. Signetics Corp.,
 
 605 F.2d 110, 113 (3rd Cir. 1979);
 
 McFarland v. Memorex Corp.,
 
 493 F.Supp. 631, 647 (N.D.Cal.1980).
 

 In light of the
 
 Lokken
 
 court’s espousal of the Fifth Circuit test for ascertaining whether a particular defendant may be deemed a Section 12 seller, the Court is of the opinion that the Eighth Circuit would similarly refuse to interpret Section 12 to include aiders and abettors. As the court observed, the acts or omissions of the alleged aider and abettor must in some manner bring him within the scope of Section 12, which applies only to sellers.
 
 Stokes v. Lokken,
 
 644 F.2d at 785. As “seller” liability may be imposed on one whose conduct “is a substantial factor in causing a transaction to take place”, and as there must be proof that a person provided “substantial assistance” before he could be held accountable as an aider and abettor, “it would be nothing more than an exercise in semantic hair-splitting” for the Court to attempt to delineate a legally cognizable distinction between those persons who might be exposed to liability as sellers under § 12(1) and those persons charged with aiding and abetting therein. See
 
 In re Ceasers Palace Securities Litigation,
 
 360 F.Supp. at 380-381.
 

 Based on the foregoing discussion, the Court finds as a matter of law that defendants Watson and Watson, P.C. cannot be held responsible as aiders and abettors in violations of Section 12(1) or its Iowa analogues, Sections 502.201 and .501, and shall therefore grant defendants’ motion for summary judgment on Counts 4 and 8. SECTION 502.203(8) TRANSACTION EXEMPTIONS
 

 Moving in the alternative for dismissal or summary judgment as to Counts 6 and 7 of the amended and substituted complaint insofar as such counts pertain to the purchase of securities by Management Service Trust, defendants Prins, Clark, Cohn, Van Wyk, Vogelaar and Watson and Watson, P.C. contend that these purchases are exempt from registration under Section 502.203(8) of the Iowa Code. Prins and Clark also argue that the exemption afforded by this provision applies to any purchase of securities transacted by Blaine Briggs, by virtue of his status as a broker-dealer. All motions shall be reviewed under the standards set forth in Federal Rule of Civil Procedure 56.
 

 1. Pension or Profit Sharing Trust Exemption
 

 Counts 6 and 7 of the amended and substituted complaint assert the management
 
 *1168
 
 defendants’ direct and vicarious liability for the sale of unregistered, nonexempt securities in contravention of Section 502.201 of the Iowa Code. According to defendants, plaintiff Management Service Trust is a “profit sharing trust” within the coverage of Section 502.203 of the Code, which provides in pertinent part:
 

 The following transactions are exempted from Sections 502.201 and 502.602:
 

 4c # sH ♦ 4c 4c
 

 8. Any offer or sale to a bank, savings institution, trust company, investment company . . . pension or profit sharing trust, or other financial institution or institutional buyer, or to a broker-dealer, whether the purchaser is acting for itself or in a fiduciary capacity.
 

 There have been no interpretive rulings to date regarding the meaning of the term “pension or profit sharing trust”, either by the state courts or the Iowa Commissioner of Insurance. Because the transaction exemption embodied in Section 502.-203(8) is virtually identical to that included in the Uniform Act, however, the Court may resort to the Act for guidance in construing its Iowa analogue. Draftsmen of the Act indicate that “[t]he obvious justification for this exemption is that institutional investors and broker-dealers are ‘sophisticated’ buyers who do not need the protection of registration.” Uniform Act § 402(b)(8). This would appear to limit the application of Section 502.203(8) to financial institutions, institutional buyers and broker-dealers, or “financially sophisticated organizations which are ‘able to fend for themselves’ and do not need the protection of registration.” Hansell & Neumann, The Iowa Uniform Securities Act Exemptions Part II: The Transaction Exemptions, 3 J.Corp.Law 437, 473 (1978). See Hayes, The New Iowa “Uniform” Securities Law, 25 Drake L.Rev. 267, 308 (1975).
 

 Accordingly, the financial sophistication of the trust may provide the key to a determination of the availability of the exemption. See Hansell & Neumann, The Uniform Securities Act Exemptions Part II: The Transaction Exemptions, 3 J.Corp.Law at 472-73 n. 237. Other factors to be considered in assessing the institutional buyer status of a particular pension and profit sharing trust are the net worth and the nature and amount of trust assets.
 
 Id.
 
 at 474. One example of an entity which might qualify for an exemption under the foregoing factors is a large labor union pension fund, presumably managed by a “sophisticated” institutional trustee.
 
 See id.
 
 at 472-73 n. 237.
 

 The statutory language itself supports plaintiffs’ position, in that the phrase “pension and profit sharing trust” is coupled with the words “or other financial institution or institutional buyer.” Applying the well-recognized principle of
 
 noscitur a sociis,
 
 which permits the meaning of a particular word to be ascertained in light of those with which it is associated,
 
 Wright v. State Board of Engineering Examiners,
 
 250 N.W.2d 412, 413 (Iowa 1977), the Court believes that the legislature intended to exempt only those experienced institutional investors who do not require the safeguards afforded by registration. Such an interpretation is consistent with the Iowa Supreme Court’s statement that any ambiguous language contained in the blue sky laws must be construed to effectuate the primary purpose of such laws, which is to protect the public from deceit perpetrated in the sale of securities.
 
 Midwest Management Corp. v. Stephens,
 
 291 N.W.2d 896, 901 (Iowa 1980).
 

 The Management Service Trust is a self-administered retirement vehicle created by Briggs to take advantage of favorable tax provisions under ERISA. While Briggs is an experienced investor, defendants do not contend that he possesses financial acumen comparable to that of an established institutional trustee engaged in the business of managing investments on behalf of client trusts. Instead, defendants’ argument rests entirely upon a literal reading of the terms of the statute to embrace all pension and profit sharing trusts which invest in securities, regardless of the experience and knowledge of the specific investor. In real
 
 *1169
 
 ity, there is no difference between Briggs as an individual and the Management Service Trust. There is no logical reason to exempt Briggs’ transactions for the trust from the act’s protection and to give protection to his acts in his own behalf.
 

 For the reasons discussed above, the Court is satisfied that the draftsmen of Section 502.203(8) did not intend to exempt offers or sales of securities to self-managed pension or profit sharing trust designed to permit the individual participant to avail himself of benefits available under the federal tax laws. The Court is of the opinion that defendants’ motions for summary judgment as to Counts 6 and 7 on that ground shall be denied.
 

 2. Broker-Dealer Exemption
 

 Section 502.203(8) also regulates transactions with broker-dealers. It is the position of defendants Prins and Clark that Blaine Briggs’ deposition testimony clearly identifies him as a broker-dealer, thus exempting all sales of securities made to him in his individual capacity or as fiduciary of the plaintiff trusts.
 

 Under Section 502.102(4) of the Iowa Code, the term “broker-dealer” includes “any person engaged in the business of effecting transactions in securities for the account of others or for such person’s own account.” In the Court’s opinion, a person is not in the business of transacting purchases of securities for his own account when he purchases securities and holds them for an extended period of time, with the intent of generating investment income. In this connection, the dollar amount involved in the transactions in issue is not determinative of the purchaser’s status.
 

 Upon review of the record, the Court believes that plaintiff Briggs, whether acting on his own behalf or as Trustee, is a private investor, who while financially knowledgeable is nonetheless entitled to invoke the protection of registration.
 
 Midwest Management Corp. v. Stephens,
 
 291 N.W.2d at 905. According to his unrefuted deposition testimony, Mr. Briggs is in the business of investing in securities, rather than conducting purchases and sales of securities on a regular basis on the open market. Under the facts and circumstances of this case, it is doubtful that this plaintiff’s activities would even suffice to place him in the category of a “trader” in securities, an “ordinary investor who buys and sells with some frequency”. 2 L. Loss, Securities Regulation 1296-1297 (1961). See Hansell & Neumann, The Iowa Uniform Securities Act Exemptions Part II: The Transaction Exemptions, 3 J.Corp.Law at 472 n. 23.
 

 Bearing in mind that substance, not form, must control the Court’s application of Iowa’s blue sky regulations,
 
 Midwest Management Corp. v. Stephens,
 
 291 N.W.2d at 902, the Court is of the opinion that the purchases of IPSCO securities by Briggs are not exempted from registration under Section 502.203(8) of the Iowa Code.
 

 Defendants’ motion for summary judgment on Counts 6 and 7 is therefore denied.
 

 ACCOUNTANT MALPRACTICE
 

 Miller and Miller, P.C., and Sauerman seek dismissal of Count 20 of the complaint, which charges these defendants with accountant malpractice. Specifically, defendants point to the absence of privity or a duty running between themselves and plaintiffs in disavowing any liability for negligence in the examination and certification of corporate financial statements. Sauerman, Miller and Miller, P.C. invoke the provisions of Federal Rule of Civil Procedure 56 by virtue of their reference to the deposition of Blaine Briggs. Also to be considered herein are motions to dismiss Count 20 filed by defendants Denman & Co., Sather and Sauerman, based on plaintiffs’ failure to satisfy the real party in interest requirement delineated in Federal Rule of Civil Procedure 17(a).
 

 1. Real Parties in Interest.
 

 As the real party in interest issue is a threshold question, the Court will consider it first. The Court is persuaded that defendants’ Rule 17(a) arguments are patently without merit. An injured third
 
 *1170
 
 party clearly possesses the substantive right under Iowa law to enforce negligence claims when appropriate circumstances exist against accountants, as the following discussion demonstrates. See
 
 Iowa Pub. Serv. Co. v. Medicine Bow Coal Co.,
 
 556 F.2d 400, 404 (8th Cir. 1977); 6 Wright & Miller, supra, § 1544 at 647-648. It follows that plaintiffs have the significant interest in pursuing their third party claims required by Rule 17(a). Whether or not these parties can pursue their negligence claims under the law and the undisputed facts is a matter entirely distinct from the threshold question of their possession of the cause of action sought to be prosecuted. Defendants’ motions to dismiss Count 20 on the ground that plaintiffs are not real parties in interest are therefore denied.
 

 2. Accountants’ Liability to Third Parties for Negligence.
 

 As this Court noted in
 
 Denbeste v. Meriwether, Wilson and Sitrick,
 
 Civil No. 74-35-D (S.D.Ia., filed September 1, 1981), the Iowa Supreme Court has not yet defined the parameters of accountant liability for negligent acts or omissions with respect to third party general investors in the accountant’s corporate client. In
 
 Denbeste,
 
 the Court relied on the rule of law first articulated by the Iowa Supreme Court in
 
 Ryan v. Kanne,
 
 170 N.W.2d 395 (Iowa 1969) in declining to impose a duty of care upon the accountant defendants therein to a “ ‘potential class of equityholders not actually foreseen’ but foreseeable at the time the [financial] statements” were prepared.
 
 Denbeste v. Meriwether, Wilson and Sitrick,
 
 slip op. at 5 (citation omitted).
 

 Plaintiffs argue that Section 552 of the Restatement 2d of Torts, quoted with approval in
 
 Larsen v. United Federal Savings & Loan Ass’n of Des Moines,
 
 300 N.W.2d 281 (Iowa 1981), compels a more expansive reading of the
 
 Ryan
 
 holding. A tentative draft of this section, which is identical to that discussed in
 
 Larsen,
 
 was also before the court in
 
 Ryan.
 
 It was that court’s opinion, however, that:
 

 the position announcement in the Restatement proposed draft [of section 552] may be accepted [only] to the extent that it extends the right to recover for negligence to persons for whose benefit and guidance the accountant
 
 knows
 
 the information is intended, especially when the party to be benefited is identified before the statement or report is submitted by the accountant.
 

 Ryan v. Kanne,
 
 170 N.W.2d at 403 (emphasis in the original).
 

 Thus while the strict rule of privity in third-party negligence actions against accountants was relaxed in
 
 Ryan
 
 to permit parties known by a particular accountant as prospective users of a report or financial statement to sue that accountant in tort, taking into consideration the aim and end of the subject transaction, the Iowa Supreme Court was not prepared to extend liability to all foreseeable persons who might rely on such report or statement.
 
 Id.
 
 As the Court subsequently opined in
 
 Larsen,
 

 We limited the
 
 Ryan
 
 rule to situations in which the party seeking recovery is ‘actually foreseen and a member of a limited class of persons contemplated’ . . . and one ‘for whose benefit and guidance the accountant
 
 knows
 
 the information is intended’ .... Thus in determining whether a duty exists . . . the key inquiry is whether .. . [the accountant] knew or should have foreseen that . . . [plaintiffs] would rely on its appraisal.
 

 Larsen v. United Federal Savings & Loan Ass’n,
 
 300 N.W.2d at 286.
 

 Under the above rationale, the
 
 Larsen
 
 court concluded that the third party purchasers of a home were entitled to rely on the accuracy of an appraiser’s report compiled at the request of the lending institution, because such purchasers could be reasonably expected to rely on the appraised value of the home, particularly where they paid for the appraisal and received the results of the report.
 
 Id.
 
 at 287. Finally, after assessing the “end and aim of the transaction”, which was to consummate a loan agreement enabling plaintiffs to pur
 
 *1171
 
 chase a home through the conveyance of a mortgage to the lender, the appraiser was held to have foreseen that both the lender and the buyers would deem the report an “important factor in their respective decisions to lend money and to borrow money to purchase the home.”
 
 Id.
 
 It appears to the Court that the number of persons who would be interested in purchasing a particular house would satisfy the “limited class” requirement. In sum, the facts and circumstances described in
 
 Larsen
 
 do not support the broad construction of
 
 Ryan
 
 advocated by plaintiffs.
 

 Because plaintiffs are members of a potentially unlimited class of investors in defendants’ client which could not reasonably have been ascertained by the defendant accountants when the latter agreed to render accounting services to IPSCO, the Court does not believe that the Iowa Supreme Court would impose a duty of care on the accountants toward this unlimited class. To allow recovery to persons similarly situated to plaintiffs would effect an unwarranted erosion of the principle, first espoused by the
 
 Ryan
 
 court, that the risk to be perceived at the time of the undertaking defines the nature of the duty of ordinary care owed to third parties.
 
 Ryan v. Kanne,
 
 170 N.W.2d at 401. Any other interpretation of Iowa precedent would expose an accountant to suits initiated by investors whom he or she could not reasonably have contemplated when a financial statement was compiled or examined on behalf of the client/issuer. See
 
 Koch Industries, Inc. v. Vosko,
 
 494 F.2d 713, 724-725 (10th Cir. 1974);
 
 Denbeste v. Meriwether, Wilson & Sitrick,
 
 slip op. at 5.
 

 An expansion of the accountants’ duty of ordinary care to include all potential lenders or investors in a public offering of instruments intended to produce risk capital would deny the defendants the protection provided by the limited duty imposed in
 
 Ryan
 
 and
 
 Larsen.
 
 This protection is premised on the Iowa Supreme Court’s recognition that the “spectre of unlimited liability” evoked by “claims devastating in number and amount” could crush an accountant defendant “because of a momentary lapse from proper care.”
 
 Beeck v. Kapalis,
 
 302 N.W.2d 90, 97 (Iowa 1981); W. Prosser, Handbook of the Law of Torts, § 107 at page 707-708 (4th ed. 1971).
 

 Imposition of a broad duty of care upon accountants to all third parties who might foreseeably rely upon negligently prepared or certified financial statements would have an extremely disruptive effect on current accounting practices. To protect themselves the accountants would greatly increase the costs of the audit to the client. Ultimately such cost would be borne by lenders, investors and the general public. Present methods of raising risk capital would be put in jeopardy. In the Court’s opinion, such additional costs of insuring against potential liability would far exceed the benefits to be derived from spreading the particular risk of loss involved herein to the public at large. The other causes of action left intact by this ruling provide adequate remedy for plaintiffs’ alleged losses.
 

 Absent any indication in the record concerning defendants’ actual knowledge of the intent of the recipient of the challenged statements, IPSCO, to supply such statements to the particular plaintiff investors, or a limited identifiable class of investors, the Court is convinced that defendants Miller and Miller, P.C. are entitled to summary judgment on Count 20 as a matter of law, and that judgment is appropriate within the meaning of Rule 56.
 

 ATTORNEY MALPRACTICE
 

 Watson and Watson, P. C. move in the alternative for dismissal or summary judgment as to Counts 5 and 9, wherein claims for attorney malpractice are raised. Both counts seek recovery for injuries allegedly sustained by plaintiffs because of defendants’ failure to exercise reasonable care to ensure IPSCO’s knowledge of and compliance with registration requirements set forth in the Securities Act of 1933 (Count 5) and analogous Iowa blue sky provisions (Count 9). According to plaintiffs, the absence of a registration statement prevented their formulation of an informed judgment
 
 *1172
 
 concerning investment in the corporation. The Court will treat their motion as one for summary judgment under Federal Rule of Civil Procedure 56.
 

 In
 
 Ryan v. Kanne,
 
 170 N.W.2d at 402, the Iowa Supreme Court recognized that the rple governing accountant liability to third parties for negligence might be applicable to attorneys. Thereafter, in
 
 Brody v. Ruby,
 
 267 N.W.2d 902 (Iowa 1978), the court considered this precise issue in a suit initiated by a physician against a former plaintiff and her lawyers in a previous medical malpractice action. Concluding that the physician could not pursue a private cause of action for attorney negligence, the
 
 Brody
 
 court declared that the injured “third party, in order to proceed successfully in a legal malpractice action, must be a direct and intended beneficiary of the lawyer’s services .... Where this special relationship between the lawyer .and the third party is lacking, courts refuse to impose liability based on legal malpractice.”
 
 Id.
 
 at 906.
 

 As the Court indicated in the context of the accountant malpractice discussion, supra, the risk reasonably to be perceived at the time of the challenged acts or omissions of professional defendants retained by the corporation defines the nature of the duty owed to third parties. Accordingly, an attorney can be held accountable only to a party whom he either knew or should have foreseen would rely on his services.
 
 Ryan v. Kanne,
 
 170 N.W.2d at 403. See
 
 Larsen
 
 v.
 
 United Federal Savings & Loan Ass’n,
 
 300 N.W.2d at 286-287; W. Prosser, Handbook of the Law of Torts, § 107, at page 708-709 (4th ed. 1971). Contrary to defendants’ contention, however, plaintiffs need not plead or prove purchaser/seller privity or reliance on counsel as a prerequisite to maintenance of a third-party claim for legal malpractice. Cf.
 
 Kurtenbach v. TeKippe,
 
 260 N.W.2d 53, 56 (Iowa 1977) (direct action against attorney, party attempting to establish the existence of an attorney-client relationship in the absence of an express contract).
 

 While plaintiffs may have been the recipients of information disseminated by Mr. Watson in his capacity as officer and director of IPSCO, See Briggs Deposition, Vol. Ill at 177, which conduct could conceivably give rise to a cause of action for breach of fiduciary duty, there is no evidence in the record that any legal advice rendered by the moving defendants to the corporation was directed toward or intended to influence the investment decisions of Mr. Briggs, individually or on behalf of his trusts.
 
 Brody v. Ruby,
 
 267 N.W.2d at 906. Absent evidence that defendants were aware that communication with their client regarding the legality of sales of unregistered securities under state and federal law would be conveyed to plaintiffs in particular, rather than to then-unidentified members of a potentially unlimited class of general investors in the client, the Iowa Supreme Court has not permitted the extension of liability for legal malpractice sought herein.
 

 As was the case with the accountant malpractice claims, the Court is convinced that the Iowa Supreme Court would not sanction the expansion of legal principles first articulated in
 
 Ryan
 
 to encompass negligence suits brought by investors in a corporate issuer against counsel for such issuer, when the investors were foreseeable but not actually foreseen by counsel at the time of the allegedly negligent dispensation of legal advice. Plaintiffs were not direct and intended beneficiaries of that advice. Summary judgment being appropriate under the facts and circumstances of this case, the Court shall grant defendants’ motion for summary judgment as to Counts 5 and 9.
 

 To summarize:
 

 (1) Motions for summary judgment as to Counts 2, 3, 4, 10, 11, 12, 13 and 16 filed by Deloitte and Miller and Miller, P. C., challenging the status of IPSCO notes and debentures as securities, are denied.
 

 (2) Deloitte’s motion for summary judgment on the amended and substituted complaint in its entirety, due to the absence of a justiciable case or controversy, is denied.
 

 
 *1173
 
 (3) Motions for summary judgment filed by Prins, Clark, Cohn, Van Wyk, Vogelaar and Wissink, and a motion to dismiss filed by Watson and Watson, P. C., directed toward claims for “controlling person” liability under state and federal law asserted in Counts 3, 7, 11, 13, and 15, are hereby denied.
 

 (4) Watson and Watson, P. C.’s motion for summary judgment on claims for aiding and abetting violations of Section 12(1) of the 1933 Securities Act, 15 U.S.C. § 771(1) and Section 12(l)’s Iowa analogues, raised in Counts 4 and 8, respectively, is hereby granted.
 

 (5) Motions for summary judgment on Counts 6 and 7, filed by Prins, Clark, Cohn, Van Wyk, Vogelaar and Watson and Watson, P. C., wherein said defendants invoke the pension and profit sharing trust exemption provided by Section 502.203(8) of the Iowa Code, are hereby denied. Prins and Clark’s motion for summary judgment on such counts, predicated upon the availability of the broker-dealer registration exemption contained in Section 502.203(8) with respect to purchases of securities made by Mr. Briggs, is also denied.
 

 (6) Motions to dismiss Count 20 filed by Denman & Co., Sather and Sauerman, based on plaintiffs’ noncompliance with Federal Rule of Civil Procedure 17(a), are denied. Motions for summary judgment on such count filed by Sauerman, Miller and Miller, P.C., premised on the nonliability of accountants under a theory of negligence to third-party investors in IPSCO, shall be granted.
 

 (7) Motion for summary judgment on attorney malpractice claims delineated in Counts 5 and 9, filed by Watson and Watson, P. C., is granted.
 

 The supplemental Order ruling upon the remainder of the motions will be issued forthwith.
 

 IT IS SO ORDERED.