**Thelma METGE, Executrix of the Estate of August Metge, and Elizabeth G. Shepherd, on behalf of themselves and on behalf of all others similarly situated, Plaintiffs,**

v.

**Robert L. BAEHLER, et al., Defendants.**

Civ. No. 76–213–1.

United States District Court, S.D. Iowa, C.D.

Jan. 9, 1984.

---

W. Don Brittin, Jr., Gerald J. Nebrough, Nyemaster, Goode, McLaughlin Emergy & O'Brien, Des Moines, Iowa, Don Kliebenstein, Kliebenstein, Heronimus & Schmidt, Grundy Center, Iowa, for plaintiffs.

Bennett A. Webster, Robert A. Gamble, Brent B. Green, Marc P. Franson, Gamble, Riepe, Burt, Webster & Davis, Des Moines, Iowa, for defendant Bankers Trust Co.

Robert B. Scism, Scalise, Scism, Sandre & Uhl, Des Moines, Iowa, for defendants Pigott, Rice, Bright, Gustafson, Loomis and Sprengeler.

Curt L. Sytsma, Des Moines, Iowa, for defendant Albert W. Moritz.

Bruce E. Mountain, Des Moines, Iowa, for defendant Carl Redding.

James A. Jackson, Des Moines, Iowa, for defendant Lloyd Jackson.

Lex Hawkins, Glenn L. Norris, George F. Davison, Jr., Hawkins & Norris, Des Moines, Iowa, for third-party defendant Beatrice Baehler.

Robert L. Baehler, pro se.

Robert F. Boyt, pro se.

Abe Clayman, pro se.

R.D. Needham, pro se.

Marlow Samuelson, pro se.

Richard F. Pigott, pro se.

## RULING AND ORDER ON BANKERS TRUST COMPANY'S MOTION FOR SUMMARY JUDGMENT

STUART, Chief Judge.

The Court has before it a motion for summary judgment filed by defendant Bankers Trust Company (BTC) on December 22, 1982. At the time BTC's motion was filed, this case had been transferred to the docket of the Hon. William C. Hanson, senior district judge, pursuant to an Order of the undersigned judge dated December 1, 1982. In an Order dated June 6, 1983, Judge Hanson transferred the case back to the undersigned judge after determining that he should disqualify himself from further participation in the case. This judge then held a hearing on BTC's motion on August 5, 1983, along with several other motions which remain pending.

### I.  *Plaintiffs' complaint.*

In their amended and substituted complaint filed September 23, 1982, plaintiffs assert claims against defendant BTC and seventeen individual defendants in three counts. Count I alleges misrepresentations and nondisclosure of material facts in connection with the sale of securities, in violation of the federal securities laws. Counts II and III are pendent state law claims based on the same basic set of factual allegations. Under Count I, plaintiffs seek to hold BTC liable for violations of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j) and Rule 10b–5 (17 C.F.R. § 240.10b–5) under three theories of secondary liability: (1) controlling person; (2) aiding and abetting; and (3) conspiracy. BTC seeks summary judgment on each of plaintiffs' claims.

### II.  *Factual background.*

Exhaustive discovery has been had in this case by plaintiffs and other parties. It can safely be said that most of the evidence relevant to BTC's motion is undisputed, and that the parties disagree primarily over the permissible inferences and legal conclu-

sions to be drawn from the evidentiary facts. These issues will be discussed in further detail elsewhere, as will much of the evidence upon which the parties rely in support of their respective positions. At this point, the Court will simply provide a brief summary of the facts of the case as a context for further discussion.

This lawsuit arises out of the sale of "thrift certificates" (promissory note-type securities) by Investors Mortgage & Finance Co. (IMF) between April 1, 1970, and May 1, 1974, in the state of Iowa. The certificates were guaranteed by IMF's parent corporation, Investors Equity, Inc. (IEI), by means of guarantee bonds. Both corporations are now defunct.

Plaintiffs are individuals (or their successors in interest) who purchased IMF thrift certificates which were not redeemed before IEI filed for bankruptcy in August 1974. At the close of the bankruptcy proceedings in 1979, plaintiffs received only 12½ cents for each dollar of accrued interest owing them; the principal has never been repaid. The defendants in this action, other than BTC, are all former officers and/or directors of IEI and/or IMF. BTC is the sole corporate defendant.

IEI, which was formed in 1961, engaged mainly in buying and selling real estate contracts throughout most of the 1960s. In early 1969, IEI formed IMF, a wholly-owned subsidiary, primarily to raise capital for IEI to use in making new investments in recreational real estate. IMF was to raise this capital by selling thrift certificates.

At first, IEI obtained thrift certificate proceeds from IMF by selling real estate contracts to IMF. Beginning in December 1970, however, this practice ceased, and IMF began loaning thrift certificate proceeds to IEI in return for IEI's unsecured promissory notes. By the time bankruptcy proceedings began in 1974, the outstanding principal balance of thrift certificates and guarantee bonds totaled $1.5 million.

BTC was IEI's banker and primary lender throughout IEI's corporate existence. IMF, however, obtained no loans from BTC and had its bank accounts elsewhere. BTC was involved in a number of lending transactions with IEI and certain IEI subsidiaries other than IMF, but only one will be discussed in this general summary. In 1971, as a result of a foreclosure, BTC acquired the stock of Mid-Iowa Lakes Corp. (MIL), and then sold the stock to IEI. It was necessary for IEI to borrow money from BTC to complete the purchase. As part of the transaction, 50,000 shares of IEI common stock were transferred to BTC's nominee, Bell & Co., a partnership of BTC officers. The parties disagree as to whether the transfer was an outright sale or merely security for the loan. Although BTC urges that a finding of the bankruptcy court is res judicata as to this question, this Court finds no need to resolve the parties' disagreement over the characterization of the stock transfer. However characterized, it is clear that legal title to the stock passed to BTC's nominee, giving BTC the power to vote 17–18% of the common stock of IEI. This was the largest single block of IEI stock.

As part of the MIL stock transaction, BTC also acquired an irrevocable proxy to vote the MIL stock. The proxy was to become effective only in the event that BTC declared a default by IEI on the MIL acquisition loan. Although IEI did become delinquent on the loan several times, BTC chose not to declare default but instead extended the note upon payment of interest by IEI.

Because of its lending relationship with IEI, BTC received IEI's annual consolidated financial statements. IMF's financial position was included therein but was not separately stated. Beginning in October 1973, BTC also received interim financial statements from IEI. IEI had suffered losses in 1973 due to the energy crisis and other problems which had caused declines in the recreational real estate business. These losses continued into 1974.

Another problem occurring in 1974 was the initiation of a new Iowa law requiring registration of thrift certificates effective May 10, 1974. Registration was not re-

quired prior to that date, and IMF's thrift certificates had never been registered. IEI officials discussed the upcoming change in the law with BTC in December 1973 and early 1974, expressing concern that registration would not be granted to IMF thrift certificates, that sales and renewals of the certificates would therefore cease, and that severe cash flow problems would result for IEI if existing certificates had to be paid off rather than renewed. These concerns became realities, and IEI was forced to file for bankruptcy. As a result of IEI's insolvency, BTC lost $543,703 in principal and $107,809 in accrued interest on its various loans to IEI.

### III. *Law governing summary judgment.*

Part (c) of Fed.R.Civ.P. 56, the summary judgment rule, provides in part: "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Part (e) of Rule 56 provides in part: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

The evidence must be viewed in the light most favorable to the non-movant, who is entitled to the benefit of all reasonable inferences to be drawn from the facts. *McClain v. Meier,* 612 F.2d 349, 356 (8th Cir.1979).

Summary judgment is a drastic remedy, and the movant bears the heavy burden of establishing his right to judgment with such clarity as to leave no room for controversy and of proving that the non-movant could not recover under any discernible circumstances. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir.1980). However, when appropriate, summary judgment fulfills the salutary purpose of avoiding useless and time-consuming trials. *Butler v. M.F.A. Life Insurance Co.,* 591 F.2d 448, 451 (8th Cir. 1979).

### IV. *Analysis.*

#### A. *Controlling person liability.*

Plaintiffs' "controlling person" claim against BTC is based on § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), which provides:

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Although there is general agreement as to the elements of proof under § 20(a), the Court's review of the case law indicates that there has not been uniform treatment concerning the party with the burden of proof on each element.

In *Briggs v. Sterner,* 529 F.Supp. 1155, 1170 (S.D.Iowa 1981), this Court stated that in order to prevail on a federal securities claim brought under § 20(a),

a complainant must prove (1) the controlled person's acts or omissions constituting an infringement of the pertinent federal securities statute; (2) that the controlling person possessed either direct or indirect influence or power over the management of the controlled person; and (3) the statutory good faith defenses are not available to the controlling person once the existence of a control relationship is established.

To the extent that this formulation places upon the plaintiff the burden of proving the controlling person's lack of good faith under § 20(a), the Court concludes that it is incorrect.[1] Although there appears to be no Eighth Circuit case law which specifically addresses the burden of proof question, cases from other jurisdictions uniformly indicate that the good faith and non-inducement component of § 20(a) is an affirmative defense upon which the controlling person has the burden of proof. *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir.1981); *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980); *Zweig v. Hearst Corp.*, 521 F.2d 1129, 1132 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *SEC v. First Securities Co. of Chicago*, 463 F.2d 981, 987 (7th Cir.), *cert. denied*, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972); *Leff v. CIP Corp.*, 540 F.Supp. 857, 867 (S.D.Ohio 1982); *Haynes v. Anderson & Strudwick, Inc.*, 508 F.Supp. 1303, 1315 (E.D.Va.1981); *Savino v. E.F. Hutton & Co.*, 507 F.Supp. 1225, 1242–43 (S.D.N.Y.1981); *Kravitz v. Pressman, Frohlich & Frost, Inc.*, 447 F.Supp. 203, 212 (D.Mass.1978); *Stern v. American Bankshares Corp.*, 429 F.Supp. 818, 823 (E.D.Wis.1977); *Moerman v. Zip-co, Inc.*, 302 F.Supp. 439, 447 (E.D.N.Y. 1969), *aff'd*, 422 F.2d 871 (2d Cir.1970); *Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417, 438 (N.D.Cal.1968), *modified in part on other grounds*, 430 F.2d 1202 (9th Cir.1970); *Lorenz v. Watson*, 258 F.Supp. 724, 732 (E.D.Pa.1966).

The Second and Third circuits, while apparently recognizing that good faith and non-inducement is an affirmative defense to be proven by the controlling person, have held that before the burden of proving good faith shifts to the controlling person, the plaintiff must prove not only that the requisite control existed, but also that the controlling person "culpably participated" in the activities which gave rise to a violation of the securities laws. *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 889–91 (3d Cir.1975);[2] *Gordon v. Burr*, 506 F.2d 1080, 1085–86 (2d Cir.1974).[3] The Ninth Circuit, without deciding whether the plaintiff must prove culpability, agrees with the Second and Third Circuits to the extent that the plaintiff's prima facie case includes at least the burden of proving that the controlling person *participated* in the activities which are claimed to violate the securities laws. *Christoffel v. E.F. Hutton & Co.*, 588 F.2d 665, 668–69 (9th Cir. 1978).[4]

---

**1.** The Court notes that the question of burden of proof was not before it in *Briggs*. Rather, the issue was whether joinder of the primary violator—as well as proof of his acts or omissions—was necessary in an action under § 20(a). 529 F.Supp. at 1170–71.

**2.** The position of the Third Circuit has been made somewhat unclear by the decision in *Gould v. American-Hawaiian Steamship Co.*, 535 F.2d 761, 779 (3d Cir.1976), where the Court cited *Rochez* with approval and yet appeared to treat culpable participation as something to be negated by the controlling persons in proving their defense.

**3.** The Second Circuit arguably abandoned this rule in *Marbury Management, Inc., supra*, when it stated that "where the erring salesman completes the transactions through the employing brokerage house and the brokerage house receives a commission on the transactions, the burden of proving good faith is shifted to the brokerage house...." 629 F.2d at 716. Judge Ward of the Eastern District of New York has read *Marbury Management* as holding that the plaintiff's prima facie burden under § 20(a) is discharged when the plaintiff presents proof of control by status, i.e., proof that the defendant had a means of controlling the principal's conduct. *Savino, supra*, 507 F.Supp. at 1243. But see *O'Connor & Assoc. v. Dean Witter Reynolds, Inc.*, 529 F.Supp. 1179, 1194–95 (S.D.N.Y.1981) (Judge Lasker applying "culpable participation" requirement in dismissing plaintiff's complaint for failure to allege facts showing knowledge, reckless disregard or participation by the controlling person in the alleged fraud).

**4.** However, in *Kersh v. General Council of the Assemblies of God*, 535 F.Supp. 494, 497–98 (N.D.Cal.1982), Judge Henderson ruled that the "participation" requirement of *Christoffel* applies only when no independent duty to supervise the controlled person exists. When the controlling person does have a duty to supervise the controlled person, the plaintiff need only allege and prove reckless nonfeasance. *Ibid.*

The Fifth Circuit has clearly rejected the position that the plaintiff must prove a controlling person's participation, culpable or otherwise, in the wrongful activity. In *G.A. Thompson & Co., supra,* 636 F.2d at 957–58, the court quoted a regulatory definition of "control" at 17 C.F.R. § 230.-405(f),[5] and stated:

> Neither this definition nor the statute [§ 20(a)] appears to require participation in the wrongful transaction.... Lack of participation and good faith constitute an affirmative defense for the controlling person. It is important to separate control from the good faith defense since the burden of proof with respect to the latter is on the defendant, while the burden of establishing control is on the plaintiff.

(Citations and footnotes omitted.) *Accord, Leff, supra,* 540 F.Supp. at 867 ("control need not be based ... on active participation in the alleged wrongful act"); *Stern, supra,* 429 F.Supp. at 824; *Holloway v. Howerdd,* 377 F.Supp. 754, 761 (M.D.Tenn. 1973), *modified in part on other grounds,* 536 F.2d 690 (6th Cir.1976); *Harriman v. E.I. Dupont de Nemours and Co.,* 372 F.Supp. 101, 105 (D.Del.1974).

The only Eighth Circuit cases which deal with controlling person liability under § 20(a), *Myzel v. Fields,* 386 F.2d 718, 737–39 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), *disapproved on other grounds, Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976), and *Klapmeier v. Telecheck International, Inc.,* 482 F.2d 247, 256–57 (8th Cir.1973), do not specifically address this question. However, neither would appear to support the proposition that the plaintiff

must prove either culpability or participation in the wrongful transaction.

■ This Court concludes that a plaintiff's prima facie case under § 20(a) does not include proof of the controlling person's culpability. Culpability and good faith are two sides of the same issue, and the cases unanimously hold that the burden of proving good faith is on the defendant. To require the plaintiff also to prove culpability would amount to giving both parties the burden of proof on the same issue.

The same may be true of participation and non-inducement, the latter being an essential part of the defendant's statutory defense. *See Harriman, supra,* 372 F.Supp. at 105 ("Under Section 20(a) the participation of a controlling person in the transaction of which plaintiffs complain is not relevant to liability except insofar as the defendant may demonstrate, by way of defense, that he did not 'directly or indirectly induce' that transaction."). In any event, the weight of authority is to the effect that the plaintiff need not prove participation in the activity which gives rise to liability, and the Court accepts that position as the law.

Having determined what the plaintiff need *not* prove, the Court now turns to what the plaintiff *must* prove to establish a prima facie case of control liability.

■ First, of course, the plaintiff must prove a primary violation of the federal securities laws.[6] *Briggs, supra,* 529 F.Supp. at 1170. Second, the plaintiff must prove that the defendant was a person who directly or indirectly controlled the primary violator at the time of the alleged violation. *Ibid.;* 5 A. Jacobs, *The Impact of Rule 10b–5* § 40.04, at 2–134 and n. 18.01 (1980)

---

5. The regulation reads:
   The term "control" ... means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.

   This regulation defines "control" for purposes of reports issuers are required to file under the Securities Exchange Act. Although it is not clear that this definition applies to § 20(a),

some courts have referred to it in discussing controlling person liability. *See* 5 A. Jacobs, *The Impact of Rule 10b–5* § 40.04, at 2–131 and n. 7 (1980), and cases cited therein.

6. Although BTC does not concede the existence of a primary violation, it does concede, for purposes of this motion only, that plaintiffs have generated a fact question on this element of proof.

("Whatever the appropriate test [for controlling person liability], it is applied as of the time of the ... [securities law] violation"). The scope of this "control" element requires further delineation.

In enacting § 20(a), Congress expressly declined to define "control", wishing to keep the concept flexible:

[W]hen reference is made to "control," the term is intended to include actual control as well as what has been called legally enforceable control.... It was thought undesirable to attempt to define the term. It would be difficult if not impossible to enumerate or to anticipate the many ways in which actual control may be exerted.

H.R.Rep. No. 1383, 73d Cong., 2d Sess. 26 (1934). Case law, however, has given some helpful content to the concept of "control".

An appropriate starting point for discussion is the following frequently quoted passage from *Myzel, supra*, 386 F.2d at 738:

The statute [§ 20(a) ] is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a "controlling person" liable.

Other courts have also stressed the broad reach and the liberal construction to be accorded § 20(a). *E.g., SEC v. First Securities Co. of Chicago, supra*, 463 F.2d at 987; *Carr v. New York Stock Exchange, Inc.*, 414 F.Supp. 1292, 1302 (N.D.Cal.1976).

■ "Control" under § 20(a) thus encompasses not only traditional agency relationships, such as employer-employee, but also any other relationship in which there exists the requisite power to influence or control. *E.g., Fey v. Walston & Co.*, 493 F.2d 1036, 1052 (7th Cir.1974); *Harriman, supra*, 372 F.Supp. at 104. Several cases and commentators have recognized the possibility that a lender could become a "controlling person" with respect to a borrower. *See In re Falstaff Brewing Corp. Antitrust Litigation*, 441 F.Supp. 62, 68 (E.D.Mo. 1977) (§ 20(a) "was probably intended to apply to relationships like that of a broker and a brokerage company or a corporation

and its controlling shareholder. However, by its terms it may apply to an entity, such as a lender, that assumes a controlling status."); D. Lehr, "Some Securities Law Issues in Lending on Pledged Stock," 38 Bus.Lwyr. 91, 100 (1982) (hereinafter, "Lehr"); A. Sommer, Jr., "Who's 'In Control'?—S.E.C.," 21 Bus.Lwyr. 559, 564, 566, 571 (1966) (hereinafter, "Sommer"). However, the Court is aware of no case in which such liability has actually been imposed on a lender. *Accord*, Lehr, *supra*, at 101. *See, e.g., Fuls v. Shastina Properties, Inc.*, 448 F.Supp. 983, 989–90 (N.D.Cal. 1978) (granting lender's motion for summary judgment on controlling person count); *Ferland v. Orange Groves of Florida, Inc.*, 377 F.Supp. 690, 707 (M.D.Fla.1974) (memorandum opinion following trial to court, finding lender not liable as controlling person).

In discussing the meaning of "control" under § 20(a), the cases have made an important distinction between the *power* to control the activities of the primary violator and the actual *exercise* of such power, holding that the mere possession of power to control is sufficient. *Rochez Brothers, Inc., supra*, 527 F.2d at 890–91 ("courts have given heavy consideration to the power or potential power to influence or control the activities of a person, as opposed to the actual exercise thereof"); *Savino, supra*, 507 F.Supp. at 1242–43; *Harriman, supra*, 372 F.Supp. at 105 (citing *Myzel, supra*); Sommer, *supra*, at 564–65.

A further distinction has been made in certain cases between control over the operations of a corporation in general and control over the specific corporate activity which gives rise to the primary violation. It has been held that a plaintiff seeking to hold a director liable as a controlling person of a corporation must first prove that the defendant actually participated in (i.e., *exercised* control over) the operations of the corporation in general; then he must prove that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but he need not prove that this

latter power was exercised. *Stern, supra,* 429 F.Supp. at 823–24; *Holloway, supra,* 377 F.Supp. at 761. *See* Note, "Liability of Corporate Directors as 'Controlling Persons' Under Section 20(a) of the Securities Exchange Act," 28 Drake L.Rev. 437, 445 (1978–79) (formulation in *Stern* provides "good theoretical framework" for determining control).

■ Although both *Stern* and *Holloway* involved the liability of corporate directors with respect to a violation perpetrated by the corporation, the Court concludes that the same test should be applied to lenders. A lender should not be held to be a controlling person on lesser proof than that required in the case of a corporate director. Moreover, sound policy reasons support the application of the *Stern* test to lenders. A corporation's primary lender almost always possesses a measure of influence over the corporation, and this influence or power normally increases if the corporation becomes delinquent on its loan payments, due to the lender's ability to threaten declaration of default and acceleration of the loan. Most commercial loan agreements also give the lender the right to exercise certain powers over the borrower corporation in the event of default or upon the occurrence of other specified events. If the mere *possession* of such power and influence over a borrower were enough to impose on the lender the burden of proving its own good faith and non-inducement in the event of a securities law violation by the borrower, the heightened potential for liability could deter lenders from making loans to corporations involved in securities transactions. The mere making of such loans would impose on lenders an onerous duty of supervision over their borrowers' activities relating to securities. The imposition of such a duty is not reasonable unless and until the lender *exercises* its power by becoming involved in the *general operations* of the corporate borrower. For these reasons, the Court adopts the formulation set forth above as a proper statement of the law

normally to be applied when control liability is sought to be imposed on the basis of a defendant's status as a lender.

It may be that a different rule would apply when the lender has obtained the right to vote a controlling block of stock in the borrower corporation as a result of a pledge of such stock as collateral for a loan. *See* Sommer, *supra,* at 571. The uncontroverted evidence in the case at bar is that BTC, as a result of the MIL stock transaction, obtained the right to vote only about 17 or 18% of the outstanding voting stock of IEI. The following is therefore pertinent:

> [W]hile unencumbered ownership of more than fifty percent of the outstanding voting power of a corporation will usually constitute control even though unexercised simply because the power to control is there, ownership of substantially less than 50% of the stock may be indicative of control *only if the power inherent in the voting power has in some fashion been manifested through the exercise of control,* usually through the election of a favorably inclined majority of the board of directors.

*Id.* at 570 (emphasis added). Because BTC had the right to vote substantially less than 50% of IEI's stock, the existence of such voting rights in this case does not call for application of a rule different from that set forth in *Stern, supra.*

The Court also takes note of the following comment from *Falstaff, supra:*

> The allegation that the lender defendants controlled the daily affairs of Falstaff, although possibly difficult to prove, is surely sufficient under § 20(a) [for purposes of ruling on a motion to dismiss]. The Court reaches this conclusion in spite of its doubts that the lenders' efforts to secure their loans through various commercially acceptable methods would make them controlling persons.

441 F.Supp. at 68 (emphasis added).[7] The Court reads this statement as suggesting

---

**7.** The plaintiff in *Falstaff* had alleged on information and belief that the lenders became in-

volved in the day-to-day operation of Falstaff. He had further alleged that the lenders threat-

that it may be inappropriate to consider lenders as controlling persons unless there is proof that they went beyond ordinary efforts to secure their loans and actually became involved in the day-to-day operation of the borrower. Such a conclusion would be consistent with the *Stern* formulation.

■ The Court must next examine the evidence in this case and determine whether plaintiffs have generated a fact question on the required threshold showing that BTC participated in (i.e., *exercised* control over) the operations of IEI during the period when IEI, through IMF, was engaged in the sale of thrift certificates (from 1970 until May 1974). Much of the evidence cited by plaintiffs as indicative of control shows at most unexercised power to control. While such evidence is probably relevant to satisfying the second prong of the *Stern* test (power to control the wrongful activity or transaction), it is not relevant to the first prong now under consideration.

Uncontroverted discovery evidence discloses the following affirmative actions of BTC with respect to IEI: (1) As a lender of substantial sums to IEI, BTC required IEI to provide it with audited annual financial statements and various other periodic financial reports. (2) On several occasions, BTC consulted with IEI concerning certain IEI acquisitions, participated in negotiations and provided financing for such acquisitions. (3) On one (and only one) occasion during the time when thrift certificates were being sold, two officers of BTC attended an IEI board of directors' meeting along with representatives of two other creditors. The minutes of this March 25, 1974, meeting reveal no active participation by the BTC officers in the meeting, but rather suggest that BTC probably attended due to its interest, as IEI's primary lender, in the financing matters which were being

discussed. (4) On one occasion, at IEI's request, BTC acted as escrow agent for the exchange of notes for thrift certificates when two holders of notes on which IEI had become liable accepted IEI's offer to exchange their notes for thrift certificates.

The Court concludes that the foregoing actions,[8] considered as a whole and viewed in the light most favorable to plaintiffs, are insufficient as a matter of law to support a finding that BTC became an active participant in the operations of IEI. In each case, BTC was only acting as an ordinary commercial banker and lender, rather than asserting control over the operation of IEI. There is no evidence, with respect to any time prior to May 1974 (when the sale of thrift certificates ceased), that BTC actually *exercised* any powers it may have possessed to become involved in the day-to-day operations of IEI.

BTC's power to vote 17 or 18% of the voting stock of IEI was also unexercised. BTC never attended an annual shareholders' meeting, and it gave IEI's management an unlimited proxy to vote the shares at the 1972, 1973 and 1974 annual meetings.

Accordingly, the Court concludes that plaintiffs have not generated a fact question with respect to their threshold burden of proving that BTC exercised control over the operations of IEI in general. It therefore becomes unnecessary to consider whether plaintiffs could generate a fact question on the issue of BTC's power to control the sale of thrift certificates, or whether BTC would prevail as a matter of law on the statutory defense of good faith and non-inducement. The Court finds that BTC is entitled to summary judgment on plaintiffs' controlling person claim under § 20(a) of the Securities Exchange Act.

---

ened to declare a default and accelerate payment on their loans unless Falstaff would: (1) replace acting directors and officers; (2) implement certain policies; (3) revise its debt structure; (4) obtain an equity investor; (5) give additional security; and (6) obtain lender approval before acquiring or selling capital assets. 441 F.Supp. at 65.

**8.** There is a great deal of other evidence in the record concerning actions taken by BTC in its role as lender to IEI. This evidence is not listed above because it is even farther removed from any indication of participation in the general operations of IEI than is the evidence cited.

820

### b. *Aiding and abetting liability.*

■ With respect to their claim that BTC aided and abetted violations of § 10(b) and Rule 10b–5, plaintiffs have the burden of proving: "(1) the existence of a securities law violation by the primary party (as opposed to the aiding and abetting party); (2) 'knowledge' of the violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *Stokes v. Lokken*, 644 F.2d 779, 782–83 (8th Cir.1981). If proof of any one of these elements is lacking, there can be no liability. *Id.* at 782, 784. Moreover, these elements—especially the second and third—must be considered in relation to one another rather than in isolation. *Id.* at 784. The Eighth Circuit has noted, for example, that "where there is a minimal showing of substantial assistance, a greater showing of scienter is required." *Ibid.* (citing *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95 (5th Cir.1975) ("scienter requirement scales upward when activity is more remote") and *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980)).

In this case, plaintiffs allege that IEI and IMF committed primary violations of § 10(b) and Rule 10b–5 by knowingly withholding material facts from persons considering purchase or renewal of IMF thrift certificates and by making material misrepresentations to such persons through newspaper advertisements. As noted in footnote 6, *supra*, BTC does not concede the existence of a primary violation, but it does concede for purposes of this motion that plaintiffs have generated a fact question on this element of proof. The Court will therefore assume for present purposes that IEI and IMF committed violations as alleged by plaintiffs.

Because the scienter or knowledge requirement varies with the amount of substantial assistance shown by the evidence, the Court turns next to the substantial assistance element. At pages 24–25 of their brief, plaintiffs cite the following affirmative actions of BTC as proof of substantial assistance. First, BTC demanded and received security for loans made to IEI and some of its subsidiaries. Also, when these borrowers became delinquent on their loans, BTC made numerous accommodations to keep the companies alive, often demanding and receiving additional collateral for doing so. In addition, although not mentioned in this portion of plaintiffs' brief, the Court again notes the one occasion on which, at IEI's request, BTC acted as escrow agent for the exchange of notes for thrift certificates when two noteholders accepted IEI's offer to make such an exchange.

The only other evidence of substantial assistance cited by plaintiffs consists of inaction: the fact that BTC did not act to halt the thrift certificate program or make disclosures to purchasers or renewers of thrift certificates.

■ The substantial assistance element of aiding and abetting has been construed as a causation concept. *Edwards & Hanly, supra*, 602 F.2d at 484. *See also Landy v. FDIC*, 486 F.2d 139, 163–64 (3d Cir. 1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *In re Investors Funding Corp. of New York Securities Litigation*, 523 F.Supp. 533, 542 (S.D. N.Y.1980); *Mendelsohn v. Capital Underwriters, Inc.*, 490 F.Supp. 1069, 1083–84 (N.D.Cal.1979). In this regard, a showing of "but for" causation is not sufficient, and courts have required a proximate causal connection. *Edwards & Hanly, supra*, 602 F.2d at 484; *In re Investors, supra*, 523 F.Supp. at 542. As stated by one court, "a plaintiff must make some factual showing that the assistance provided by the alleged aider and abettor was a substantial factor in bringing about the violation." *Mendelsohn, supra*, 490 F.Supp. at 1084. In other words, the material misrepresentations and omissions of IEI/IMF in connection with sales and renewals of thrift certificates (hereinafter referred to as "the fraud") must have been a "direct or reasonably foreseeable consequence" of BTC's con-

duct. *In re Investors, supra,* 523 F.Supp. at 542.

■ The Court now examines the affirmative acts of BTC in light of the foregoing principles. BTC's demand for collateral when making loans or accommodations on loans to IEI and some of its subsidiaries is an ordinary banking practice which has no discernible causal connection with the IEI/IMF fraud. That practice may have had an effect on the amount of damages incurred by plaintiffs as a *result* of the fraud, but that is not the issue here. The issue is causation of the fraud itself.

BTC's efforts to keep the borrowing companies alive by making accommodations when delinquencies occurred may be sufficient to show "but for" causation,[9] but it cannot reasonably be said that the IEI/IMF fraud was a direct or reasonably foreseeable consequence of those efforts. Moreover, in *Landy, supra,* 486 F.2d at 163, the court rejected the notion that "substantial assistance" could be equated "with a business transaction ... which foreseeably permits one of the parties to it ... to independently engage in illegal action as to other parties". Thus, even if IEI/IMF's continued fraud *could* be considered a foreseeable consequence of BTC's efforts to keep IEI alive, those efforts would not constitute substantial assistance in the view of the *Landy* court.

BTC's only involvement with IMF thrift certificates was in its role as an escrow agent on one occasion, referred to earlier. This minor involvement was clearly tangential and ministerial and could not, as a matter of law, constitute substantial assistance to the fraud.

All that remains, then, is evidence of BTC's inaction. The question of whether, or to what extent, silence and inaction can fulfill the substantial assistance requirement apparently has not been addressed by the Eighth Circuit. It is a troublesome question upon which other courts have reached a variety of conclusions. *See, e.g.,*

*Woodward, supra,* 522 F.2d at 96–97, and cases cited therein.

Some courts have held that silence and inaction cannot be a basis for aiding and abetting liability in the absence of an independent duty to disclose, i.e., a duty owed by the aider/abettor to the plaintiff either by statute or by virtue of common law. *Stern, supra,* 429 F.Supp. at 825–26; *see also Mendelsohn, supra,* 490 F.Supp. at 1086–87. In this case, it is clear that no such independent statutory or common law duty was owed by BTC to purchasers of IMF thrift certificates. This was true even in the one instance where BTC had some involvement in a thrift certificate transaction as an escrow agent. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151–52, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972).

The Second Circuit, in *IIT v. Cornfeld,* 619 F.2d 909, 927 (2d Cir.1980), has likewise adopted the rule that inaction can create aider and abettor liability only when there is a violation of an independent duty to act, but it recognizes one exception. Under that exception, inaction can support liability in the absence of an independent duty if: (1) there is "clear evidence" of the required degree of scienter (the second element of aiding and abetting), and (2) there is "a conscious and specific motivation for not acting on the part of an entity with a direct involvement in the transaction." *Ibid.* This exception is inapplicable here even without regard to scienter and motivation, because there is no evidence that BTC had any direct involvement in the sale of thrift certificates.

Still another variation of the rule has been adopted by the Fifth Circuit in *Woodward, supra,* 522 F.2d at 97. "When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable [on the basis of silence and inaction] only if scienter of the high 'conscious intent' variety can be proved." The same

---

**9.** I.e., but for the continued existence of IEI, the thrift certificate program and accompanying

fraud could not have continued.

rule, stated somewhat differently, is followed in the Third Circuit. *See Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 800 (3d Cir.), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978) (inaction may provide predicate for liability only where plaintiff demonstrates that aider-abettor *"consciously* intended to assist in the perpetration" of a securities law violation (emphasis in original)). Under the *Woodward-Monsen* test an evaluation of the evidence of scienter would become necessary in this case, although under the tests discussed in the two preceding paragraphs, BTC would be entitled to summary judgment on the aiding-abetting claim without consideration of scienter. Since it is unclear which test the Eighth Circuit would adopt, the Court will assume the *Woodward-Monsen* test is applicable and will therefore proceed to the scienter element.

In discussing the scienter requirement for primary liability under § 10(b) and Rule 10b–5, the Supreme Court in *Hochfelder, supra,* 425 U.S. at 194 n. 12, 96 S.Ct. at 1381 n. 12, made the following statement:

> In this opinion the term "scienter" refers to a mental state embracing intent to deceive, manipulate, or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. *We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5.*

(Emphasis added.) In the context of aiding and abetting liability, the question of whether a reckless failure to discover the primary violation, as opposed to actual knowledge of such violation, is sufficient to satisfy the knowledge or scienter requirement also remains open in the Eighth Circuit. *Stokes, supra,* 644 F.2d at 783. There are several reasons why the Court need not decide in this case whether a reckless failure to discover the primary violation would be sufficient. First, plaintiffs state in their brief: *"Plaintiffs do not allege BTC violated any duty to investigate or discover fraud,* but instead ...

allege that BTC in fact knew, or had to have known, of the securities law violations (misrepresentations and nondisclosures) committed by IEI and IMF." (Emphasis added.) Second, even if plaintiffs had made no such statement, the *Woodward-Monsen* test being applied under the present circumstances requires proof of high conscious intent, and recklessness clearly falls short of that standard.

What plaintiffs must prove in this case, then, is that BTC had actual knowledge of the thrift certificate fraud and a high conscious intent to assist in the perpetration of that fraud by means of its silence and inaction. The Court will focus on the question of actual knowledge, because without such knowledge BTC could not have had the high *conscious* intent required by the *Woodward-Monsen* test.

■ As is often necessary with such issues, plaintiffs rely on circumstantial evidence and inferences for proof of BTC's knowledge and intent. The standards for drawing inferences on a motion for summary judgment were recently summarized by the Eighth Circuit in *Impro Products, Inc. v. Herrick,* 715 F.2d 1267 (8th Cir.1983). Although *Impro* was a conspiracy case in which inferences were relied upon for proof of an agreement, this Court is of the opinion that the same standards apply where, as here, inferences are relied upon for proof of actual knowledge of another party's fraud. The standards stated in *Impro,* as modified solely with reference to the issue of knowledge, are as follows. First, plaintiffs are not required to directly prove the fact of BTC's actual knowledge; evidence from which such knowledge could be inferred is sufficient. *Impro,* 715 F.2d at 1272. However, to avoid summary judgment, "the facts and circumstances relied upon must attain the dignity of substantial evidence and not be such as merely to create a suspicion." *Ibid.* (quoting *Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877, 884 (8th Cir.1978)). In other words, the circumstances shown must lead to the conclusion with reasonable certainty.

*Id.* at 1279. Furthermore, an inference which a jury is entitled to draw may not be based upon *other* inferences but must be based on proven facts. *Id.* at 1272.

With the foregoing principles in mind, the Court will review the evidence in this record relating to the question of whether BTC had actual knowledge of IEI/IMF's fraud. Deposition testimony by BTC officials indicates that BTC had a general knowledge of what thrift certificates were, as such certificates were being sold in Iowa by a number of companies at rates of interest higher than those offered by banks. Beyond such general knowledge, testimony and affidavits indicate that BTC knew little or nothing about IMF's particular thrift certificate program aside from the fact that the thrift certificates appeared as a liability on IEI's consolidated balance sheets which were furnished periodically to BTC. Uncontroverted testimony and affidavits also show that no one from IEI or IMF ever discussed the IMF thrift certificates with any BTC official until December 1973 and early 1974, when the new Iowa law requiring registration of the certificates was about to take effect. These discussions took place shortly before the sale of thrift certificates ceased in May 1974. Finally, and of primary importance, BTC officials testified and stated in their affidavits that they had no knowledge as to what information was being disclosed or not disclosed to potential thrift certificate purchasers.[10]

Despite BTC officials' sworn denials of knowledge of the fraud, plaintiffs assert that the record contains evidence which indicates BTC "must have known" of the fraud.[11] Plaintiffs note that the IEI balance sheets furnished to BTC showed a tenfold increase in thrift certificate debt from September 1970 to November 1973, and they also point to evidence that BTC

had knowledge of the increasingly poor financial condition of IEI and IMF during this time period. Plaintiffs further cite evidence that BTC president Robert J. Sterling knew there was no effective regulation of the sale of thrift certificates in Iowa at the time in question. "Knowing all of this," plaintiffs argue, "BTC *had* to know that the only way IMF and IEI could be successfully selling its Thrift Certificates was without disclosing its true financial condition to purchasers. At least, no one could reasonably deny that a jury could reasonably so find."

The Court cannot agree. The fact that BTC possessed the foregoing information does not support an inference that it knew a full and proper disclosure was not being made to prospective purchasers of thrift certificates. The information might have caused BTC to speculate as to the reason for the increased sales and to suspect that IMF and IEI were not conducting the thrift certificate sales properly. BTC might even have been negligent in failing to obtain more information about the sales methods being used. However, as plaintiffs concede, liability as an aider and abettor is based on knowledge, not on the negligence standard of "should have known".

There are several reasons why the Court does not believe that a trier of fact could infer from the foregoing evidence that BTC had to know that the only way the thrift certificates could be so successfully marketed was by failing to disclose the companies' true financial condition to prospective purchasers. First, the Court believes that such an inference would depend not only on evidentiary facts, but also on an assumption that if disclosure of the companies' financial condition had been made, thrift certificate sales would not have been as

**10.** With regard to the newspaper advertisements in which misrepresentations allegedly appeared, the affidavits and testimony indicate that BTC officials do not recall seeing the IMF thrift certificate ads, but that even if they had seen the ads, they would not have known whether or not the statements made therein were correct because of their lack of knowledge about the operations of IMF.

**11.** The Court does not equate the phrase "must have known" with "should have known". Plaintiffs apparently intend the phrase "must have known" to suggest an inference of actual knowledge, while "should have known" would encompass a negligent failure to discover.

successful as they were. Only if this underlying assumption is true does the conclusion reached by plaintiffs follow with any reasonable degree of certainty from the facts in evidence. *See Impro, supra,* 715 F.2d at 1279.

In this regard, the Court notes that although IMF had a negative net worth by September 30, 1972, it was IEI which guaranteed the thrift certificates. Thus, information about the overall financial condition of IEI probably would have been of most concern to potential thrift certificate purchasers. Although IEI had a net operating loss beginning in fiscal 1972, IEI's consolidated balance sheets (which included IMF and other subsidiaries of IEI) showed a net worth of $975,000 at the end of fiscal 1972 and $500,000 at the end of fiscal 1973. This meant that there should have been enough to fully pay all creditors, including thrift certificate holders, and still leave the above-stated amounts for distribution to shareholders. Thus, in spite of the companies' financial difficulties, the situation regarding protection of thrift certificate purchasers did not appear so grave as to necessarily deter would-be purchasers to whom disclosure was made. In addition, an aggressive sales and advertising campaign promoting the higher interest rates offered on the thrift certificates could have attracted investors. It is well known in the financial world that many investors will assume obvious risks as a trade-off for a higher rate of return.

It is clear from the foregoing that plaintiffs' underlying assumption is questionable. Accordingly, it would be highly speculative to infer that BTC would have made that same assumption. If permissible inferences cannot depend on other inferences, *Impro, supra,* 715 F.2d at 1272, they clearly cannot depend on speculative or questionable assumptions.

Even if the underlying assumption were less questionable, there would be another significant problem with plaintiffs' suggested inference. Despite the "must have *known*" language used by plaintiffs, the strongest conclusion that could actually be

reached by use of plaintiffs' inference is that BTC must have *assumed* or strongly suspected that full disclosure was not being made to thrift certificate purchasers. An inference that a party made an assumption or had a strong suspicion does not rise to the level of an inference that the party had actual knowledge; thus, it is insufficient to prove the high conscious intent necessary under the *Woodward-Monsen* test.

Finally, the Court notes the similarity of plaintiffs' suggested inference to one discussed in *Impro, supra.* In that case, when a former official of the plaintiff corporation was asked to explain the facts on which he believed that one of the corporate defendants was aware of the allegedly illegal activities of a university professor who was doing some consulting work for the defendant company, the plaintiff's witness stated:

> They must have been aware of it or else they wouldn't have paid him. It's obvious to me.... They must know what their people are doing or else they couldn't stay in business. Now that's just a fact, that they're an efficient company and have competent personnel, so when they hire someone and pay them a considerable amount of money, they must know what he's doing.

*Impro, supra,* 715 F.2d at 1278 n. 13. The inference that the corporate defendant "must have known" for the reasons stated by the witness was rejected by the Eighth Circuit as insufficient to controvert the company's sworn denials of knowledge or to generate a fact question on that issue.

In conclusion, the Court holds that BTC is entitled to summary judgment on plaintiffs' aiding and abetting claim, either because the uncontroverted evidence of BTC's role in relation to the primary fraud is legally insufficient to constitute "substantial assistance" under the tests set forth in *Stern* and *Cornfeld, supra,* or alternatively, if the *Woodward-Monsen* test is applied, because the undisputed facts do not support a reasonable inference that BTC had actual knowledge of the pri-

mary fraud and a high conscious intent to assist in its perpetration.

### C. *Conspiracy liability.*

 Little need be said about plaintiffs' conspiracy claim. In their own brief, plaintiffs quote the following correct statement of law from *Staffin v. Greenberg,* 509 F.Supp. 825, 834 (E.D.Pa.1981), *aff'd,* 672 F.2d 1196 (3d Cir.1982): "[A]ll courts agree that knowledge of the wrongful act is an indispensible [sic] element of a conspiracy charge under section 10(b) and Rule 10b–5." As the Court has explained in conjunction with the aiding and abetting claim, the undisputed facts in this case do not support a reasonable inference that BTC had actual knowledge of the IEI/IMF fraud. BTC is therefore entitled to summary judgment on the conspiracy claim.

### D. *Pendent state law claim.*

 The only remaining claims against BTC are the pendent state law claims of Counts II and III of the amended complaint. When all federal claims against a party are disposed of before trial, the normal practice is to dismiss pendent claims without prejudice. *Stokes, supra,* 644 F.2d at 785. Plaintiffs' claims against BTC in Counts II and III will therefore be dismissed without prejudice.

### V. *Reassertion of BTC's motion to dismiss.*

In making its motion for summary judgment, BTC reasserted its prior motion to dismiss plaintiffs' amended complaint for failure to state a claim upon which relief can be granted. In light of the foregoing disposition of plaintiffs' claims against BTC, it is unnecessary for the Court to consider BTC's reasserted motion to dismiss.

IT IS THEREFORE ORDERED that the motion for summary judgment filed by defendant Bankers Trust Company be and it hereby is granted as to all claims in Count I of plaintiffs' amended and substituted complaint.

IT IS FURTHER ORDERED that plaintiffs' pendent state law claims against defendant Bankers Trust Company, contained in Counts II and III of the amended and substituted complaint, be and they hereby are dismissed without prejudice.

IT IS FURTHER ORDERED that the reasserted motion to dismiss of Bankers Trust Company will not be considered, as it is moot.

IT IS FURTHER ORDERED that, because there is no just reason for delay, the Clerk shall enter final judgment pursuant to Fed.R.Civ.P. 54(b) in favor of defendant Bankers Trust Company and against plaintiffs on all claims in Count I of plaintiffs' amended and substituted complaint.